GROEHN *v.* CORPORATION & SECURITIES COMMISSION.

1. States—Powers of Civil Service Commission.

The State civil service commission has plenary power upon review of action taken by an appointing authority to take such action in the regulation of the State civil service by way of acceptance, modification or rejection of the action taken by the appointing authority or by the hearing board of the commission as may seem to the commission to be merited (Const 1908, art 6, § 22; Civil Service Commission Rules 16, 30, 38–40).

2. Same—Civil Service Commission—Dismissal of Employees.

There is no restriction upon the State civil service commission as to the surrounding or extenuating circumstances which are to be investigated in connection with the discharge of an employee from the State civil service by an appointing authority and such circumstances include the offense leading to the discharge, the need of discipline in the department, and the effect of the example of the employee's conduct upon other employees, all to the end that the commission may hear and pass upon all questions involved in the controversy (Const 1908, art 6, § 22; Civil Service Commission Rules Nos 16, 30, 38–40).

---

References for Points in Headnotes

[2, 3] 10 Am Jur, Civil Service § 11.
[4] 10 Am Jur, Civil Service § 14.
[7] 12 Am Jur, Contracts § 169.

3. SAME—CIVIL SERVICE COMMISSION—POWERS OF INVESTIGATION.

The investigative powers of the State civil service commission are as broad as its responsibility and it may properly take testimony and receive exhibits in addition to that provided its hearing board in a controversy as to the dismissal of an employee from the State service (Const 1908, art 6, § 22; Civil Service Commission Rules Nos 16, 30, 38–40).

4. SAME—CIVIL SERVICE COMMISSION—REVIEW OF ACTION BY SUPREME COURT.

The review by the Supreme Court of the action taken with respect to the dismissal of an employee from the State civil service is that of the State civil service commission itself as distinguished from that of its hearing board, especially where the findings of the board are not adopted by the commission (Const 1908, art 6, § 22; Civil Service Commission Rules Nos 16, 30, 38–40).

5. OFFICERS—DEPUTY COMMISSIONER—REAL ESTATE—VIOLATION OF REGULATION.

The fact that plaintiff, deputy commissioner in charge of the regulation of real-estate practices in the State, himself engaged in buying and selling real estate, *held*, not to have been shown by so doing to have violated any order or regulation of the employing agency, the corporation and securities commission.

6. APPEAL AND ERROR—QUESTIONS REVIEWABLE—PUBLIC POLICY.

Claim that conduct of plaintiff in buying and selling real estate while he functioned as deputy commissioner in charge of the regulation of real-estate practices was against public policy is considered by the Supreme Court in corporation and securities commission's appeal from order of civil service commission suspending plaintiff for period of 3 months and then ordering him reinstated under named conditions notwithstanding he was not suspended for violating public policy, where such question is briefed and is of importance in our scheme of government.

7. WORDS AND PHRASES—PUBLIC POLICY.

Substantially, public policy is the community common sense and common conscience, extended and applied throughout the State to matters of public morals, public health, public safety, public welfare, and the like, that general and well-settled public opinion relating to man's plain, palpable duty to his fellow men, having regard to all the circumstances of each particular relation and situation, and being declared by the Constitution, statute or judicial decision.

8.. OFFICERS—DEPUTY CORPORATION AND SECURITIES COMMISSIONER—
  REAL ESTATE—PUBLIC POLICY.

    Conduct of deputy corporation and securities commissioner in
      charge of the regulation of real-estate practices in the State
      in buying and selling real estate with an average of 6 trans-
      actions a year for period of some 16 years *held,* not violative
      of public policy in the absence of a claim of fraud, dis-
      honesty, sharp practice, overreaching, or use of his official
      capacity to obtain special favors, hence, not a basis for either
      removal or suspension.

Appeal from Civil Service Commission. Submitted June 11, 1957. (Docket No. 50, Calendar No. 46,782.) Decided November 26, 1957.

Hearing under civil service procedure by Harold G. Groehn against Corporation and Securities Commission to test validity of discharge from position of deputy commissioner in charge of regulation of real-estate practice. Order entered for reinstatement following a limited period of suspension. Defendant appeals. Plaintiff cross-appeals. Civil Service Commission added as party defendant. Reinstatement approved and case reversed and remanded to delete order of suspension.

*Zwerdling, Zwerdling, Keith & Livingston* (*Morris Zwerdling, Wallace A. Colwell* and *Irving H. Small,* of counsel), for plaintiff.

*Thomas M. Kavanagh,* Attorney General, *Edmund E. Shepherd,* Solicitor General, *Stanton S. Faville,* Chief Assistant Attorney General, and *Daniel J. O'Hara,* Assistant Attorney General, for defendant Corporation and Securities Commission.

*Jennings, Fraser, Parsons & Trebilcock* (*Archie C. Fraser* and *James R. Davis,* of counsel), for defendant Civil Service Commission.

SMITH, J. Here we are concerned with disciplinary action against a civil servant. His superior, the commissioner of the Michigan corporation and securities commission, discharged him. The hearing board of the civil service commission sustained the discharge. The civil service commission itself, however, rescinded the order of discharge and reinstated him, but suspended him for 3 months. He contends, before us, that even the suspension was improper.

The plaintiff is Harold Groehn. He is a lawyer and practiced for several years, specializing in real-estate and probate law, before entering the service of the State in 1939. In course of time he rose to the position of deputy commissioner in charge of the regulation of real-estate practices in Michigan. His duties, in such capacity, as defined by civil service standards, comprised the following:

"Directs the preparation and administration of examinations for applicants for original license and renewal.

"Has responsibility for approving or denying applications for licenses from real-estate brokers and salesmen.

"Conducts hearings on complaints of violations against brokers or salesmen.

"Makes findings of fact and recommends disciplinary action against violators of real-estate license law and regulations.

"Constructs proposed revision of real-estate legislation."

Other requirements for this position, as defined by civil service, are these:

"Physical condition adequate for performance of the work.

"Tact and similar qualities necessary in meeting and dealing effectively with others.

"Knowledge of governmental regulation and control of real-estate transactions.

"Knowledge of the fundamentals of real-estate practice including the essentials of selling, leasing, mortgaging and brokerage.

"Knowledge of methods of conducting investigations and hearings to obtain facts relative to violation of regulations.

"Knowledge of the sources for verifying the business records of real-estate salesmen and brokers.

"Ability to interpret regulatory and licensing laws.

"Ability to schedule work, maintain discipline, and generally administer the personnel of the real-estate division.

"Ability to conduct impartial hearings.

"Ability to maintain records, prepare reports and conduct correspondence relative to the work."

During plaintiff's years in State employment he served under 5 different commissioners. His civil service ratings are, in part, before us. We note that the rating given him in the year 1954, immediately prior to his separation (for his work in the previous year), was the highest on the form. He had held national office in his field and there is much evidence in the record concerning his high standing and his good repute. Why, then, was he discharged?

It seems to have come about in this way: In October or November of 1954, Commissioner Allen was called by a real-estate broker and informed that the plaintiff had, over a period of years, engaged in a series of real-estate transactions. A list thereof was furnished. It commenced with a purchase of 2 lots by plaintiff, 15 years, he testified, before he entered the service of the State, at a time when he was 19 years of age. The list went on to cover the next 21 years, comprising purchases and sales of plaintiff's private residences, family transactions (such as for his sister), quitclaims to clear title, and investments. Excluding some 25 transactions before Groehn en-

tered State service, excluding the personal residence and family transactions, quitclaim deeds, and so forth, the asserted total of approximately 150 items and "over a quarter of a million dollars," boils down to about a hundred items, or, approximately 6 per year. In fairness to the parties we deem it pertinent to state at this point that plaintiff insists that such dealings on his part were in strict conformity with the regulations of his commission, concerning which we will write in some detail at a later point. We also note plaintiff's charge that the complainant furnishing such list to the commission had an execrable record with plaintiff Groehn's division of the corporation commission, and for this reason was "out to get" plaintiff. We will not examine this charge beyond observing that, at an earlier date, complainant filed charges against Groehn with the grievance committee of the State bar association with respect to which attorney Ezra Frye testified "the decision was unanimous after a day of testimony that there was no evidence of any character indicating any misconduct on the part of Mr. Groehn."

Commissioner Allen, upon receipt of this lengthy record, conferred with plaintiff, received his explanations, made clear that he was not charging plaintiff with dishonesty, fraud, overreaching, or taking advantage of his official position, but decided that he should be discharged. His reasons therefor are set forth in detail in the record:

"Harold G. Groehn is the deputy commissioner in charge of administering the real-estate license law. The final exercise of this commission's authority, however, is my complete responsibility. I feel that, with cause, I cannot continue to hold public reliance upon the advice, recommendations and conclusions in matters submitted by Mr. Groehn for my consideration.

"From information which has recently been revealed to me, it appears that Mr. Groehn has, during his employment with this commission, engaged in a course of dealing in real estate.

"It is my opinion that this course of dealing is incompatible with Mr. Groehn's official position in relation to the real-estate business. The real-estate values involved in the transactions, as well as the number and consistency of the transactions, lead me to the conclusion that Mr. Groehn's continuance in the State service is unwarranted because:

"1. Whether or not the transactions have been fair in all respects, Mr. Groehn's involvement in real estate raises the problem of his ability to be impartial in fact, and the further problem of public acceptance of his impartiality, in that it appears that his private and public interests are in conflict.

"2. The dealings are, in my opinion, such as to constitute 'a principal vocation,' for which a license is required under sections 2 and 3 of the real-estate license law.*

"3. The dealings can only distract from the attention needed to fulfill Mr. Groehn's official duties.

"It is my further opinion that, in view of Mr. Groehn's present real-estate holdings, he is not in a position to cease the activity complained of.

"I have, therefore, determined upon his dismissal."

Plaintiff thereupon appealed to the hearing board of civil service pursuant to civil service Rule 40. The hearing was held, testimony taken, and numerous exhibits received in evidence. Plaintiff then filed a motion to set aside the action of the appointing authority upon the following grounds:

"1. Removal of this long-time civil servant was based solely on a claimed 'loss of confidence' by a new commissioner who will soon be lost to State service.

---

* See CL 1948, §§ 451.202, 451.203 (Stat Ann 1955 Cum Supp §§ 19.792, 19.793).—Reporter.

"2. Transactions over a 16-year period, known to and approved by the then commissioners, cannot form a basis for removal action by the present new commissioner.

"3. The commissioner has completed his case without showing any basis for removal.

"4. The claimed reasons for removal in the separation report of the commissioner are not a permissible basis for removal under the civil service rules."

The hearing board, in turn, upheld plaintiff's dismissal on the following grounds:

"The hearing board having heard and considered the evidence presented in the matter of the dismissal of Harold G. Groehn finds as follows:

"(1) That there was no manifest unfairness or discrimination shown in the dismissal of Harold G. Groehn:

"(2) That the corporation and securities commission's charges were proven to such degree that the hearing board is of the unanimous opinion, based upon substantial evidence, that Harold G. Groehn was engaged in dealing in real estate, both privately and with real-estate brokers, as a major vocation on his part:

"(3) The hearing board is of the opinion that outside employment, within reasonable limits, in and of itself is not sufficient to justify dismissal; however, when, as in the instant case, such activity is both closely related to his State employment and is a major vocation, then it is grounds for dismissal, because the employee then has placed himself in a position which is untenable and incompatible with the responsibilities of his employment with the State of Michigan."

Plaintiff then appealed to the civil service commission itself. Hearing by such commission was held on November 23d, at which time some testimony was taken and argument made. Following such hear-

ing, and on the same day, the commission made the following order:

"The civil service commission suspends Mr. Harold G. Groehn without recourse to back pay for the period March 1, 1955 to June 1, 1955, and orders his reinstatement with back pay, less any compensation earned in outside employment, to his position as deputy commissioner of the Michigan corporation and securities commission.

"The commission notes with concern that Mr. Harold G. Groehn has been engaged in real-estate dealings which might lead to conflict of interest, but the full implications of these real-estate dealings were not defined to Mr. Groehn prior to his dismissal.

"The civil service commission reconfirms its position already recorded in previous directives concerning activities which in quantity or nature interfere with the rendering of satisfactory and impartial service to the State. Appointing authorities have the responsibilitiy of fully acquainting their employees with these requirements.

"As a condition of reinstatement Mr. Groehn is ordered to desist from further real-estate dealings while holding the position referred to above. All other actions concerning Mr. Groehn, inconsistent with this decision, are to that extent rescinded."

Upon leave granted the corporation and securities commission appealed to this Court, the motion of the civil service commission to "be added to the within proceedings as a party-defendant-appellee" was granted, and plaintiff claimed a cross appeal "in the nature of certiorari and mandamus."

A procedural matter must first be disposed of. It is the position of the corporation and securities commission (hereafter called the corporation commission) that the order of the civil service commission (hereafter called civil service) violated its own rules and constituted an abuse of discretion. That, in

short, while the appointing authority (corporation commission) can dismiss or suspend, and while civil service may review, and upon such review may reverse for lack of proof, or may affirm in a proper case, it cannot "modify an order of removal to read one of suspension, any more than it could raise the penalty from suspension to removal."

The authority for the position is said to be found in the commission's own rules which vest broad powers in the appointing authority. Thus under Rules 16, 30 and 38, the appointing authority may dismiss for certain reasons and under Rule 39 it may suspend. Rule 40 establishes a procedure for appeal from such actions. A "hearing board" provides the first hearing, but it is also provided that "all decisions of the hearing board may be appealed to the civil service commission." It is at this point that the thrust of the corporation commission's argument becomes most evident, for it is argued that upon this appeal to the civil service commission, so authorized and so taken, civil service has no power to modify. It may only accept or reject.

No authority is cited for this position nor any rule of civil service. On the contrary, that portion of Rule 40 pertaining to appeals to the commission itself contains no limitation upon the final action to be taken by it. Moreover, it is highly questionable if, under our constitutional amendment, which entrusts to civil service the regulation of "all conditions of employment in the State civil service" (Const 1908, art 6, § 22), it could so strip itself of its plenary powers (*Plec* v. *Liquor Control Commission*, 322 Mich 691) even if it so desired, but we need not discuss the constitutional question since it is our opinion that civil service has not even attempted to do so. Specific language expressive thereof cannot be found and it is not to be inferred that an agency, under a constitutional grant so ex-

plicit, would purport to deprive itself of final authority to act as it might ultimately deem best, regardless of action taken on various lower levels by agents whose only powers are those delegated by the civil service commission itself. Indicative of the plenary powers regarded by civil service as retained in itself, although not in this instance exercised, are the provisions of Rule 40, "Appeals from administrative decisions," providing in section F thereof as follows:

"Notwithstanding the foregoing provisions of this rule, the commission may dispense with the investigation of any controversy, supersede the hearing board, assume jurisdiction in any particular case, and itself conduct the hearing on appeal from any personal decision of the director or of any appointing authority."

Although differences in statutory or constitutional phraseology may be found in other jurisdictions, the following holding (*Hackett* v. *Morse,* 45 Cal App 788, 790, 791 [188 P 308]), well expresses our opinion on this branch of the case:

"It is our opinion that since the board shall fully hear and determine the matter, it must hear and pass upon all questions involved in the controversy. The question of what is a reasonable punishment for an offense is as important as the question of whether or not an employee committed an offense, and it is as necessary for the accomplishment of the purposes of the civil service system that the board have power to investigate the one as the other. There being no restriction upon the civil service board, we must hold that power fully to 'hear and determine the matter' means power fully to hear and determine all parts of the 'matter.' The 'matter' under investigation is the discharge of the plaintiff by the commissioners, the offense leading to his discharge, the surrounding or extenuating circumstances, the need of

discipline in 'the department in which the plaintiff was employed, and the effect of the example of the plaintiff's conduct upon other employees, are all parts of the larger question to be investigated by the board."

What has been held above also disposes of the contention that the civil service commission itself is limited to determination solely of whether or not the findings of its hearing board were supported by competent evidence. The commission may, in the performance of its constitutional functions, provide for whatever assistance (hearing boards, administrative officers, and the like) it may require for the efficient performance of its duties. But the final authority and responsibility remain its own despite these delegations, and its investigative powers in aid of its final decision remain as broad as its responsibility. We note, in passing, that civil service did not regard itself as limited in the exercise of its authority on appeal. It took certain additional testimony and received additional exhibits. There was no error therein.

We come now to the validity of the decision before us for review, namely, the suspension of the plaintiff for 3 months. We will note at the outset of our discussion thereof that we are not reviewing the order or action of the hearing board. That is not before us. The order before us, the order from which an appeal was taken, was the order of the civil service commission itself, not that of any subordinate agent or agents thereof. The corporation commission submits to us an ingenious argument to the effect that the civil service commission actually "upheld" the factual findings of its hearing board, therefore such in turn became the commission's findings, with all of the legal consequences that attach to such findings. The difficulty with this argument is that it just won't wash. The basis of the hearing board's approval of

the dismissal of Groehn was its finding that his dealings in real estate formed "a major vocation on his part." He had thus, it was said, placed himself (in view of his State responsibilities with respect to real-estate brokers) in a position incompatible with his State employment. Civil service, however, did not find such a major vocation, nor did it adopt or uphold such a finding. Why it failed or refused to do so we are not told, nor need we speculate, although some reluctance on the part of at least 1 of the civil service commission to accept this theory may be found in his statement to the corporation commissioner: "Now certainly you can't argue that even a half dozen deals a year throughout 16 years would constitute in any man's life his principal vocation."

The decision before us for review, then, is that of the civil service commission itself. It has been set forth *in haec verba* heretofore. It may be simply summarized: (1) It suspended plaintiff for 3 months but ordered his reinstatement into State service; (2) it gave its reason— he had "been engaged in real-estate dealings which might lead to a conflict of interest;" (3) it confirmed previous directives concerning incompatible activities by State employees; (4) it attached a condition to reinstatement, that plaintiff "desist from further real-estate dealings." In all of the above it is the second item, the reason for suspension, which demands our scrutiny. Did such prior engagement (in real-estate dealings) on the part of Groehn violate any order or regulation of the corporation commission? If so, it is not cited to us either in the briefs or upon argument and our examination of the applicable rules and regulations does not disclose it.

But we now reach what appellant apparently regards as the core of the case, an argument that, regardless of specific rules or regulations, what plaintiff did (buying and selling of real estate) was

against public policy. We might be justified in disposing summarily of this argument by saying that until and unless plaintiff is suspended for violating public policy we will not meet the issue. But the earnestness with which it is pressed upon us (a supplementary brief is devoted to it) and the importance of the question in our scheme of government both merit that it be given some recognition.

We turn, then, to public policy. Definition thereof, as we pointed out in *Skutt* v. *City of Grand Rapids,* 275 Mich 258, 264, has not been formulated by our courts. " 'In substance,' " we there said, quoting with approval from *Pittsburgh, C. C. & St. L. R. Co.* v. *Kinney,* 95 Ohio St 64, 68 (115 NE 505, LRA1917D, 641, Ann Cas 1918B, 286), " 'it may be said to be the community common sense and common conscience, extended and applied throughout the State to matters of public morals, public health, public safety, public welfare, and the like. It is that general and well-settled public opinion relating to man's plain, palpable duty to his fellow men, having due regard to all the circumstances of each particular relation and situation.' " This we will accept. We continued, quoting, " 'sometimes such public policy is declared by Constitution; sometimes by statute; sometimes by judicial decision.' "

What, specifically, was the alleged violation of public policy by the plaintiff? He had bought and sold real estate while employed by the corporation commission and while deputy commissioner thereof, with duties as aforesaid. His transactions, over some 16 years, amounted to an average of about 6 per year. Let us note here, lest misapprehension arise, several things this case does not involve: There is no charge of fraud or dishonesty, of sharp practices or overreaching, or use of an official position to obtain special favors. The reputation of the employee for integrity is admitted by the commissioner. The

charge is really one of violation of ethics, of propriety, as Commissioner Allen admitted. These are, indeed, matters of the utmost gravity. But equally important is an individual's good name. If charged with dishonesty, that is one thing. A specific act can be proved or disproved. But if charged with violation of ethics, of the proprieties, that is another. It is in this field of the proprieties that the dangers of *ex post facto* become most critical, because the ethics of yesterday are not the ethics of today. Such, at any rate, is mankind's hope.

We return, then, to the specific offense charged, the buying and selling of real estate. Was this forbidden by the rules or policy of the commission? For answer we return to such rules:

"7. In dealings with persons in the real-estate or residential contracting field, where those businesses are licensed by the commission:

"(a) All transactions are to be completely expressed in writing, and a complete file on each transaction should be retained. This does not apply to transactions involving small or insignificant amounts of money.

"(b) Prices paid should be in line with the market.

"(c) Records of all transactions are to be made available for inspection by the commissioner at his request."

At the hearing before the hearing board some effort was made, with respect to a transaction in Macomb county, to show that certain farm land was purchased at a bargain, and some effort to show that certain other properties were sold at a handsome profit, but no final conclusions of violation were found with respect to these or any other transaction in the record, and the testimony finally trails off into nothingness, vague charges, innuendoes and heated denials. If there had been any violation of requirements (a), (b), or (c) above, the board was given

every opportunity to find it, but its labors finally brought forth only the conclusion that dealing in real estate was plaintiff's "major vocation." The discharge approved by the board, it is to be noted, was not based upon plaintiff's violation of the regulation above quoted, or, indeed, upon any violation of "public policy" in engaging in real-estate transactions as such. His offense lay in the finding that he had engaged in too many transactions ("outside employment, within reasonable limits, in and of itself is not sufficient to justify dismissal"). They were his "major vocation."* Such an argument, in itself, negates the claimed offense against public policy. If dealings in real estate by one in plaintiff's position are bad as against public policy, the evil as well lies in the first transaction as the next.

The difficulty upon the facts before us, with appellant's public-policy argument (that the dismissal of plaintiff is justified because his real-estate transactions violated public policy) lies in the commission's own regulations. Where a branch of government permits certain transactions by its employees (here, dealing in real estate) upon stipulated conditions, and those conditions are satisfied, we are not disposed to find in those same permitted dealings the violation of some vague, unstated, undefined "public policy." We are not, it will be noted, discussing an act *malum in se.* There is nothing intrinsically wrong in dealing in real estate. As for incompatibility of plaintiff's actions with the duties of his office, we learn from the record that it is a commonplace, in other States in the Union, to have practicing real-estate brokers as members of commissions set up to administer and enforce real-estate

---

* These words have a definite connotation in the record, referring to the requirement that a license shall be required of one engaging in the sale of real estate "as a principal vocation." (CL 1948, § 451.-202 [Stat Ann 1955 Cum Supp § 19.792].) .

licensing laws. If dealing as an owner, not a broker, in real estate for personal investment was wrong here, it was wrong not because the acts were *malum in se* but because of the conditions under which they were accomplished. Yet we are cited to no finding of violation by plaintiff of the conditions imposed by the commission concerning such transactions. We note also that there is here no question of hidden transactions, of subterfuge, or stealth. Plaintiff's former commissioner puts the matter thus:

"During my approximate term of 10 years as commissioner from 1939–1949 I was well aware of the fact that Harold G. Groehn, deputy commissioner, was investing his savings in the purchase of vacant lots, land contracts, and several houses in which he lived from time to time. At nó time did he permit such personal investments to interfere with his good judgment or in his recommendations to me as commissioner. I have always believed and still do that anyone has the constitutional right to invest his own money as he or she sees fit. I do not believe that such investments are incompatible with Mr. Groehn's official position in relation to the real-estate business. At no time while I was commissioner, did any member of the public or any real-estate broker or salesmen ever complain to me about Mr. Groehn's investments. I have always found Mr. Groehn to be honest and sincere in his efforts to keep the standards of the real-estate profession on a very high plane."

What we seem to have is a series of admittedly honest, admittedly above-board, straight-forward transactions, offensive to the latest of the commissioners, inoffensive to those preceding.

This, of course, leads directly to the doctrine of *ex post facto*. Let there be no misunderstanding concerning its application or the standard-of-ethics problem presented. It is to be hoped by all that the passage of time will see a continuous progressive

evolution in our standards of morality, of conduct, and of performance of duty, in all of those tangibles going to make up what we call "ethics," "proprieties," or "public policy." (*Skutt* v. *City of Grand Rapids, supra.*) There can be no question but that successive public officials have the power to impose ever-higher standards upon the agencies committed to their charge. But that is not the problem in the case before us. (Plaintiff Groehn, in fact, offered to Commissioner Allen "to cease any buying or selling of real estate" but the reply was that the commissioner did not think he could do it.) Our problem is more basic, more elementary. It is this: Can a man be punished today for actions of yesterday that were neither dishonest nor fraudulent nor disobedient at that time? We say not. If his actions were wrong yesterday he can be punished today. If they are wrong today he can be punished today or tomorrow. But he cannot be punished today because yesterday's actions (complying with the then-applicable regulations) do not meet today's standards. So much for public policy.

We do not find it necessary to discuss whether or not Groehn's dealings constituted "supplementary employment" (who would be his employer?) or whether his "conduct was unbecoming that of a State employee" since he was not punished for either engaging in supplementary employment or for unbecoming conduct. Even if it had been the latter, it would not be easy to say that an employee whose dealings in real estate meet the standards of his commission is guilty of unbecoming conduct.

The order of the civil service commission suspended plaintiff Groehn because his real-estate dealings "might" lead to conflict of interest. Supension on such ground was unwarranted by any rule, regulation, or statute cited to us and was an abuse of discretion. The order is reversed in this particular

and remanded to the commission for modification not inconsistent herewith. That portion of the order requiring plaintiff "to desist from further real-estate dealings while holding the position referred to above" is not challenged in these proceedings, nor affected hereby, although the commission's clarification of the word "dealings" in order not to prevent Mr. Groehn from disposing of any present holdings, or buying or selling a personal residence, would seem desirable.

Reversed. Costs to cross appellant.

DETHMERS, C. J., and SHARPE, EDWARDS, VOELKER, CARR, and BLACK, JJ., concurred.

KELLY, J., did not sit.