COUNCIL NO 11, AFSCME v CIVIL SERVICE COMMISSION

Docket No. 62418. Argued November 13, 1979 (Calendar No. 3).—
Decided May 27, 1980.

Council #11 of the American Federation of State, County and
Municipal Employees, AFL-CIO, and Myrl Lockett, Phil Helms,
Betty Pearson, Bing Johnson, and Robert G. Cusack, state
employees in the classified service, brought an action against
the Civil Service Commission for a declaratory judgment and
injunctive relief against the enforcement of Rule 7 of the Civil
Service Commission, which regulates political activity of classi-
fied civil service employees, and in the case of Cusack for
reinstatement in his civil service job and other relief. The
complaint alleged that Rule 7 violates the state Constitution
and conflicts with 1976 PA 169, which permits certain political
activities of public employees. The Civil Service Commission, in
its answer, asked that the court hold 1976 PA 169 unconstitu-
tional insofar as it purports to apply to employees in the state
classified civil service. The Wayne Circuit Court, Roy J. Daniel,
J., entered a declaratory judgment holding both the statute and
the rule valid as construed in the judgment, and dismissed the
complaints for injunctive and other relief. Plaintiffs and defen-
dant appealed to the Court of Appeals. That Court, Allen, P.J.,
and D. E. Holbrook, Jr., and M. J. Kelly, JJ., held that 1976 PA
169 applied to employees in the state classified civil service,
and that Rule 7 is impermissibly overbroad, and reversed the
dismissal of the complaint as to Cusack's discharge and re-
manded (Docket No. 77-2165). The Civil Service Commission
appeals. *Held:*

1976 PA 169 (MCL 15.401 *et seq.;* MSA 4.1702[1] *et seq.)*

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 4, 6-8] 15 Am Jur 2d, Civil Rights §§ 243, 245.

26 Am Jur 2d, Elections § 387.

Prohibiting public employees from running for elective office as
violation of employee's federal constitutional rights. 44 ALR Fed
306.

[3] 16 Am Jur 2d, Constitutional Law § 150.

[5] 16 Am Jur 2d, Constitutional Law § 85.

[9] 15A Am Jur 2d, Civil Service § 10.

properly applies to employees of the state classified civil service, and to the extent that Rule 7 is in conflict with the statute or otherwise purports to regulate the off-duty political activity of state classified civil service employees, it is invalid.

1. The Legislature has the power, even the duty, to protect and insure the personal freedom of all citizens, including the rights of free speech and political association. The statute is an *uncommon exercise of this power in that it authorizes and* extends to a specific class of citizens, employees in the state classified civil service, the right to engage in partisan political activity, serve as convention delegates, and run for elective *office while on mandatory leave of absence. Most legislation by* states on the subject has been enacted to restrict sharply or entirely preclude the kind of partisan political activity authorized by this statute.

2. The Civil Service Commission claims that it has exclusive jurisdiction to regulate political activity of classified civil servants, derived from the fourth paragraph of Const 1963, art 11, § 5, which provides that the commission shall "make rules and regulations covering all personnel transactions, and regulate all conditions of employment in the classified service". It claims that therefore, to the extent that it conflicts with Rule 7, the statute is unconstitutional. A statute will not be declared unconstitutional unless it is plain that it violates some provisions of the Constitution, so the question is whether it is "plain" that the statute violates the provision of the Constitution relied on by the Civil Service Commission. It is necessary to examine the history of the civil service system in Michigan and the origin of the constitutional provision to address the question adequately.

3. The civil service system was instituted in 1937 by legislation intended to eliminate the "spoils system" or "patronage system" of state employment, after a study commission appointed by the Governor had recommended establishment of a civil service system. The legislation specifically prohibited participation in political activities and assessment schemes "during the hours of * * * employment". In 1939 amending legislation seriously weakened the new system, but extended the prohibition to a flat ban on all political activity; the ban was more cosmetic than real because of a great increase in the number of "exempt" employees and a hiring preference for former state employees. In 1940 a constitutional amendment was adopted establishing a state civil service system, superseding the 1939 legislation. Conspicuously absent was a flat ban on all political activity which had been recommended in the study

commission report and enacted in 1939. Thus, when given an opportunity to speak directly, the people of the state showed no disposition to prohibit off-duty political activity. Rule 7 was adopted in substantially its present form soon after, in effect reenacting much of the prohibition of the 1939 legislation. The Attorney General almost immediately issued an opinion holding that the commission was without authority to enact such a rule. The new Constitution of 1963 retained essentially the˅ provisions of the 1940 amendment concerning the state civil service system, and does not prohibit political activity, on or off the job.

4. Neither the history of the adoption of the civil service system nor a commonsense reading of the plain language of the present Constitution, interpreted according to familiar rules of constitutional construction, support the defendant's claim of authority to regulate or prohibit off-duty political activity by state classified employees. Had the voters, when they adopted the civil service amendment in 1940, intended that civil servants must forfeit active off-duty participation in politics as the price of public employment in the classified service, they could have done so in plain language. That they did not is strongly suggestive of a knowing rejection of such a prohibition.

5. Of greater significance is the plain language of the Constitution itself. The primary rule in interpreting constitutional language is the rule of "common understanding": the interpretation that should be given it is that which reasonable minds, the great mass of the people themselves would give it, and it is to be supposed that the people have accepted the words used in the sense most obvious to the common understanding. A grant of power to an administrative agency to curtail pervasively the political freedom of thousands of citizens should not be easily inferred from a constitutional provision devoid on its face of any such language. Certainly it cannot be concluded with any degree of confidence that the great mass of the people themselves would understand the language of the constitution relied on by the commission to be a grant of power to forbid off-duty political activity.

6. The commission certainly has the authority to regulate employment-related activity involving internal matters such as job specifications, compensation, grievance procedures, discipline, collective bargaining, and job performance, including the power to prohibit activity during working hours which is found to interfere with satisfactory job performance. The commission may also regulate and even prohibit off-duty activity which is found to interfere with job performance. That power does not,

however, extend to the blanket prohibition of off-duty activities, political or otherwise, as a matter of policy simply because such activities may conceivably interfere with satisfactory job performance. What an employee does in his off-duty hours is not a proper concern of the commission unless it is shown to affect job performance adversely, and even then the commission's authority is not to curtail the off-hours activity but to deal with the adequacy of job performance. If off-duty political involvement adversely affects a classified employee's performance at work, the commission is empowered to deal with it case-by-case. The difficulty of proof is an argument for strengthening testing and evaluation procedures and establishing more satisfactory objective criteria of job performance, not for eliminating the constitutionally guaranteed freedom of the employee. The commission's constitutional "sphere of authority" delimits its rule-making power and confines its jurisdiction over the political activity of classified personnel to on-the-job behavior related to job performance.

Affirmed.

87 Mich App 420; 274 NW2d 804 (1978) affirmed.

1. CIVIL SERVICE — POLITICAL ACTIVITY — STATUTES — COMMISSION RULES.

The statute which permits certain political activities of public employees properly applies to employees of the state classified civil service, and to the extent that a rule of the Civil Service Commission which regulates political activity of classified civil service employees is in conflict with the statute or otherwise purports to regulate the off-duty political activity of state classified civil service employees, it is invalid (MCL 15.401 et seq.; MSA 4.1702[1] et seq.; Civil Service Commission Rule 7).

2. CIVIL RIGHTS — CONSTITUTIONAL LAW.

The Legislature has the power, even the duty, to protect and insure the personal freedom of all citizens including the rights of free speech and political activity (Const 1963, art 1, §§ 1, 2, 3, 5).

3. CONSTITUTIONAL LAW — STATUTES.

A statute will not be declared unconstitutional unless it is plain that it violates some provision of the Constitution.

4. CIVIL SERVICE — POLITICAL ACTIVITY — CONSTITUTIONAL LAW.

Neither the history of the adoption of the civil service system nor a commonsense reading of the plain language of the present Constitution, interpreted according to familiar rules of constitu-

tional construction, support a claim by the Civil Service Commission of the authority to regulate or prohibit off-duty political activity by state classified employees; that the voters, when they adopted the civil service amendment in 1940, did not say in plain language that civil servants must forfeit active off-duty participation in politics as the price of public employment in the classified service is strongly suggestive of a knowing rejection of such a prohibition (Const 1908, art 6, § 22; Const 1963, art 11, § 5).

5. CONSTITUTIONAL LAW — CONSTRUCTION.

The primary rule in interpreting constitutional language is the rule of "common understanding": the interpretation that should be given it is that which reasonable minds, the great mass of the people themselves would give it, and it is to be supposed that the people have accepted the words used in the sense most obvious to the common understanding.

6. CONSTITUTIONAL LAW — CIVIL RIGHTS — POLITICAL ACTIVITY — ADMINISTRATIVE LAW.

A grant of power to an administrative agency to curtail pervasively the political freedom of thousands of citizens should not be easily inferred from a constitutional provision devoid on its face of any such language.

7. CIVIL SERVICE — POLITICAL ACTIVITY — CONSTITUTIONAL LAW.

The Civil Service Commission may regulate and prohibit activity during working hours, or even off-duty activity, which is found to interfere with job performance; that power does not, however, extend to the blanket prohibition of off-duty activities, political or otherwise, as a matter of policy simply because such activities may conceivably interfere with satisfactory job performance (Const 1963, art 11, § 5).

8. CIVIL SERVICE — POLITICAL ACTIVITY — CONSTITUTIONAL LAW.

What a classified civil service employee does in his off-duty hours is not a proper concern of the Civil Service Commission unless it is shown to affect job performance adversely, and even then the commission's authority is not to curtail the off-hours activity but to deal with the adequacy of job performance; if off-duty political involvement adversely affects a classified employee's performance at work, the Civil Service Commission is empowered to deal with it case-by-case (Const 1963, art 11, § 5).

9. CIVIL SERVICE — CONSTITUTIONAL LAW — SEPARATION OF POWERS.

The Constitution vests the Civil Service Commission with plenary powers in its "sphere of authority", which delimits its rule-

making power and confines its jurisdiction over the activity of classified personnel; since the grant of power is from the Constitution, any executive, legislative or judicial attempt at incursion into that "sphere" would be unavailing (Const 1963, art 11, § 5).

*Zwerdling & Maurer* (by *George B. Washington)* for plaintiffs.

*MacLean, Seaman, Laing & Guilford* (by *Kenneth Laing* and *Kathleen Opperwall)* for defendant.

Amicus Curiae:

*Edward M. Wise,* General Counsel, for American Civil Liberties Union Fund of Michigan.

RYAN, J. This ·case involves a conflict between the rule-making power of the Michigan Civil Service Commission and the law-making power of the Legislature and the need to determine which, upon the facts before us, is controlling.

We granted leave to appeal[1] to consider two specific issues raised in the defendant-appellant's application for leave to appeal:

1) Whether 1976 PA 169[2] has application to

---

[1] 406 Mich 920 (1979).

[2] 1976 PA 169, MCL 15.401 *et seq.;* MSA 4.1702(1) *et seq.,* states in pertinent part:

"Sec. 2. An employee of the state classified civil service may:

"(a) Become a member of a political party committee formed or authorized under the election laws of this state.

"(b) Be a delegate to a state convention, or a district or county convention held by a political party in this state.

"(c) Become a candidate for nomination and election to any district, county, city, village, township, school district, or other local elective office without first obtaining a leave of absence from his employment. If the person becomes a candidate for elective office in the executive or legislative branches of the state or for the supreme court or court of appeals, the person shall request and shall be granted a leave of absence without pay when he complies with the candidacy filing requirements, or 60 days before any election relating to that position, whichever date is closer to the election.

employees in the state classified civil service; and

2) Whether Rule 7 of the Michigan Civil Service Commission[3] constitutionally regulates the political activities of employees in the state civil service.

Our answer to the first question is "Yes". We do not reach the second issue.

Specifically, we hold that 1976 PA 169 properly applies to classified employees of the state civil service and that, to the extent that Rule 7 is in conflict with the statute or otherwise purports to regulate the off-duty political activity of state classified civil service employees, it is invalid. In view of our holding on that question, we do not reach the constitutional issue.

## I. FACTS

On September 22, 1976, plaintiffs filed a comp-

---

"(d) Engage in other political activities on behalf of a candidate or issue in connection with partisan or nonpartisan elections.

\* \* \*

"Sec. 4. The activities permitted by sections 2 and 3 shall not be actively engaged in by a public employee during those hours when that person is being compensated for the performance of that person's duties as a public employee."

[3] Rule 7 of the Michigan Civil Service Commission states in pertinent part:

"7.1 Prohibited Activities—No employee in the state civil service shall engage in any political activity while on duty, nor shall he be or become: An officer in a political party or organization; a member of any political party committee formed or authorized under the general election laws of the state; a delegate to any state, district or county convention held by any political party in this state; a member of any national political party committee; a delegate from this state to any national political party convention.

\* \* \*

"7.3 Candidates for Public Office—No employees in the state civil service shall become a candidate for nomination to any partisan elective office without first obtaining a leave of absence. The leave of absence shall remain in force and effect until the candidacy becomes official by the filing of petitions or by the action of a caucus or a convention, or by a filing fee. When a state civil service employee becomes an official candidate for elective office set forth as above, he shall at once resign from his civil service position."

laint in Wayne Circuit Court alleging that Rule 7 is invalid because it conflicts with 1976 PA 169 and because it violates Const 1963, art 1, § 5.[4] Plaintiff Council 11, American Federation of State, County and Municipal Employees is a labor union representing approximately 6,500 of the nearly 65,000 classified employees in the state civil service. Plaintiff Robert Cusack was employed in the state civil service as an Attendant Nurse 04. He was discharged for violating Civil Service Commission Rule 7.3 in that he filed nominating petitions to become a candidate for Sheriff of Ionia County. The other individual plaintiffs were also employed by the state at the time the complaint was filed.

The trial court issued a declaratory judgment upholding both the statute and the Civil Service Commission rule, and in an attempt to reconcile their conflicting provisions found:

"Section 7.1 of the Rules of the Civil Service Commission, as interpreted, and limited to the regulation of employees within the scope of employment within the state classified service, is a proper and constitutional exercise of authority."

"Insofar as § 2(c) of the PA 169 of 1976 is incompatible with § 7.3 of the rules of the commission, it may be without application to certain members of the classified state service."

Employing a balancing test, the court found that the "interests of the state in maintaining a separation between state employment and partisan pursuits outweighs an [individual employee's] interest to campaign *[sic]* for partisan office while continu-

---

[4] "Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press." Const 1963, art 1, § 5.

ing [in] state employment".[5] Consequently, plaintiff Cusack's discharge for filing petitions to become a candidate for partisan elective office was upheld.

Both parties appealed to the Court of Appeals. That Court upheld the application of 1976 PA 169 to the state classified service, found no compelling state interest to justify a blanket ban on civil service employees' off-duty political activity, and struck down Rule 7 as impermissibly overbroad. The Court announced adoption of a rule requiring a case-by-case approach in the future in determining whether particular political activity adversely affects job performance. Because plaintiff Cusack was discharged without a showing that his off-duty political activity hindered his job performance, the Court of Appeals reversed the lower court ruling dismissing Cusack's complaint and ordered a remand. *Council No. 11, AFSCME, AFL-CIO v Civil Service Comm,* 87 Mich App 420; 274 NW2d 804 (1978).

The defendant Civil Service Commission now contends, as it did before the Court of Appeals, that its authority to order a flat ban on the off-duty as well as on-duty partisan political activity by all state classified civil service employees, as described in Rule 7, is derived from "the plain language" of Const 1963, art 11, § 5; that its constitutional authority to do so is preemptive of legislative power to legislate in conflict therewith; and that the "same conclusion follows from the case law interpreting the [Michigan] Constitution and the history of civil service in Michigan".[6]

Plaintiffs, on the other hand, claim that as between the legislative enactment specifically authorizing state classified civil servants to enjoy the

---

[5] Opinion and Decision of the Circuit Court, p 17.

[6] Appellant's Brief on Appeal, p 5.

exercise of freedom of speech and expression involved in off-duty political activity, including running for public office, and the Civil Service Commission prohibition of such activity, the legislative enactment is controlling. Plaintiff claims that is so because neither the "plain language" of Const 1963, art 11, § 5, our prior cases, nor the history of civil service in Michigan justify the appellant's conclusion that the Civil Service Commission is empowered to ban off-duty political activity, even in the absence of legislative authorization to the contrary. Plaintiffs claim further that the Rule 7 ban on off-duty political activity violates both the Federal and state constitutional provisions guaranteeing to all citizens freedom of speech.

## II. APPLICABILITY OF 1976 PA 169 TO CIVIL SERVICE EMPLOYEES

The power, indeed the duty, to protect and insure the personal freedoms of all citizens, including the rights of free speech and political association, is reposed in the Legislature as one of the three co-equal branches of government by art 1 of the Michigan Constitution.[7] The enactment of laws

[7] Const 1963, art 1 provides in pertinent part:

"Sec. 1. All political power is inherent in the people. Government is instituted for their equal benefit, security and protection.

"Sec. 2. No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation.

"Sec. 3. The people have the right peaceably to assemble, to consult for the common good, to instruct their representatives and to petition the government for redress of grievances.

* * *

"Sec. 5. Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press."

designed to assure the protection and enhancement of such rights is therefore a particularly proper legislative concern.

For example, by a specific grant of power from the people in art 2 of the state Constitution, the Legislature has been given the responsibility of regulating nominations and elections, providing for the registration of voters, declaring their eligibility within constitutional limits and, in general, enacting laws guaranteeing in myriad ways the rights of citizens to participate in the political process and exercise the elective franchise. It is well settled that the Legislature of this state is empowered to enact laws to promote and regulate political campaigns and candidacies. *Evans v Detroit Election Comm,* 381 Mich 382; 162 NW2d 141 (1968); *Jeffries v Wayne County Election Comm,* 294 Mich 255; 293 NW 546 (1940); *People v Gansley,* 191 Mich 357; 158 NW 195 (1916).

1976 PA 169 is an uncommon exercise of this power in that it undertakes to authorize and extend to a specific class of citizens—employees in the state classified civil service—the right to engage in partisan political activity, serve as convention delegates, and run for elective office while on mandatory leave of absence. In most cases, when state legislatures have addressed the subject of political activity by state classified civil servants, it has been to sharply restrict or entirely preclude the kind of partisan politicking authorized by 1976 PA 169.[8]

Defendant claims the statute is unconstitutional to the extent that it conflicts with Rule 7, because the Civil Service Commission enjoys exclusive jurisdiction, derived from art 11, § 5 of the Constitu-

[8] See *Broadrick v Oklahoma,* 413 US 601, 604, fn 2; 93 S Ct 2908; 37 L Ed 2d 830 (1973).

tion, specifically the fourth paragraph thereof, to "legislate" on the subject of political activity by classified civil servants. That paragraph states:

[Commission's Duties as to Classification, Compensation, Examinations, Personnel Transactions and Conditions of Employment.]

"The commission shall classify all positions in the classified service according to their respective duties and responsibilities, fix rates of compensation for all classes of positions, approve or disapprove disbursements for all personal services, determine by competitive examination and performance exclusively on the basis of merit, efficiency and fitness the qualifications of all candidates for positions in the classified service, *make rules and regulations covering all personnel transactions, and regulate all conditions of employment in the classified service.*" (Emphasis added.)

It is upon the emphasized reference to "all personnel transactions" and "all conditions of employment" that defendant principally relies for its claim of authority.

In *Oakland County Taxpayers' League v Oakland County Supervisors,* 355 Mich 305, 323; 94 NW2d 875 (1959), a test was formulated to determine whether a statute is constitutional. We held:

"[T]his Court will not declare a statute unconstitutional unless it is plain that it violates some provisions of the Constitution and the constitutionality of the act will be supported by all possible presumptions not clearly inconsistent with the language and the subject matter."

We turn then to the question whether it is "plain" that 1976 PA 169 violates art 11, § 5 of the state Constitution and specifically the provision thereof which declares that the Civil Service Com-

mission shall "regulate all conditions of employment in the classified service".

To address the issue adequately, it is necessary to examine the history of the civil service system in Michigan and the origin of the constitutional provision here in question.

It is generally agreed that this state's civil service system came into being as a result of the 1936 Report of the Civil Service Study Commission. Appointed by Governor Frank D. Fitzgerald in October, 1935, the study commission undertook a year-long study of "personnel practices of the state with a view to determining, in as accurate a way as possible, the most important evils from which the state has been suffering".[9] The result was a 94-page ringing condemnation of the longstanding "spoils system", or "patronage system"[10] of state personnel practices and detailed recommendations for the enactment of legislation to establish a state civil service system. A draft bill, to which reference will be made hereafter, was filed as a part of the report.

The focus of the report was primarily upon the system of political appointments, promotions, demotions, rewards and punishments which have

[9] Preface to the Report of the Civil Service Study Commission, July 20, 1936.

[10] A portion of the report declared:

"The spoils system presupposes the existence of government jobs to be filled with loyal party workers who can be counted on not to do the state job better than it can be done by others, but rather to do the party work or the candidate work when elections roll around. The state office buildings are nearly empty during political conventions, and state money has always been used—indirectly of course—to enable state employees to move about the state and keep political fences in repair.

"It is impossible to estimate the loss to the state of this kind of political activity, but the most inexperienced know that the amount is considerable. Not only is the regular work of the state interrupted or interfered with, but its services and funds are put at the disposal of political parties."

always been a part of the traditional spoils system. Assessment schemes and participation in political activity during working hours were seen as serious and expensive causes of poor job performance by unqualified civil servants. Although political activity during working hours was a principal concern expressed in the report, § XXII of the Study Commission's Proposed Civil Service Bill included a total ban on political activity, off-duty as well as on. It provided:

"(1) In applying the provisions of this Act or in doing any of the things hereby provided for, no person whosoever shall give any weight to political or religious considerations. No person holding a position in the classified service nor any member of the Commission shall directly or indirectly solicit or receive or be in any manner concerned with soliciting or receiving any assistance or subscriptions or contributions for any political party or political purpose, nor participate in any form of political activity whatsoever other than to express freely his views as a citizen and to cast his vote in any election."

The following year, in response to the study commission's findings and recommendations and heightened public interest, the Legislature enacted 1937 PA 346 which purported to eliminate the "spoils system" and specifically prohibited participation in political activities and assessment schemes, but only "during the hours of * * * employment".[11]

---

[11] "No person who is subject to the provisions of this act, while retaining his right to vote as he pleases or express privately his opinions on political subjects, shall take any active part in political management or campaigns *during the hours of his employment.*" (Emphasis added.) 1937 PA 346, § 22(3).

"[N]o person receiving any salary or compensation for services from the state shall *during the hours of his employment* directly or indirectly solicit or receive or be in any manner concerned in soliciting or receiving any assessment, subscription or contribution for any

The next regular session, obviously dissatisfied with reform that had been wrought, the newly elected anti-civil-service Legislature adopted a group of bills designed primarily to destroy the civil service system which had just been established by:

—Sharply curtailing the state classified civil service; 1939 PA 245, § 7.

—Attempting to diminish the authority of the professional civil service director by repealing a provision that the executive and administrative functions of the department were to be vested exclusively in the director and by making him an appointee of the commission, to serve at its pleasure; 1939 PA 97, § 6; 1939 PA 245, § 5.

—Reducing the agency's appropriation, thereby necessitating a serious reduction in staff and services; 1939 PA 97, § 26.

—Providing increased employment preferences for veterans and former state employees; 1939 PA 97, § 14.[12]

Surprisingly, however, while badly crippling the new-born civil service system, the 1939 legislation replaced the 1937 prohibition against political activity by civil servants during working hours with a flat ban on all political activity, and did so in language virtually identical to that which appeared in the civil service study commission draft bill which accompanied its 1936 report. Upon close

political purpose whatever from any other employee of the state." 1937 PA 346, § 22(1).

"No one shall directly or indirectly solicit or receive or be in any manner concerned with soliciting or receiving any subscriptions or contributions for any purpose whatsoever *during the hours of employment* of any state employee, nor shall any organization circulate any petitions, literature or any form of advertising in any state office." (Emphasis added.) 1937 PA 346, § 22(5).

[12] See Litchfield, *Another Chapter in Michigan Civil Service Reform,* 35 American Political Science Review (No 1) 76, 77 (1941).

examination, several explanations for that seeming inconsistency begin to emerge: During 1939 and 1940 the number of "exempt" civil service positions soared; the percentage of state employees serving in classified positions plummeted from 90.7% in January, 1939 to 51.1% in March, 1940; only the lowest paying jobs were retained as classified positions; and, in addition, resignations from the civil service sharply increased in 1939 and 1940.[13] Further evidence that the ban on political activity by classified employees was more cosmetic than real as a means of bringing a merit system to state employment, is the fact that the new legislation included a provision giving a preference in hiring to veterans and former state employees. As Professor Litchfield pointed out:

"The act provided 'that each person competing in any test who has had four years' previous service with the state in the same or in any similar class of employment shall be given an earned credit of 10 per cent and if, at any time, he had more than four years of such service a 2 per cent additional earned credit for each additional year of such service, such earned credit for previous service in no event, however, to exceed a total of 60 per cent.' There can be no question but that any measure contemplating a 60 per cent preference for previous state service is decidedly incompatible with the principle of merit in state employment."

Finally, in 1940, apparently dissatisfied with

[13] Mr. Litchfield, a close observer of the tortured course of civil service in Michigan, noted that there was more than at first met the eye in the Legislature's ban on all political activity:

"As originally enacted the section prohibited political activity only during office hours and, as a consequence, amounted to almost no limitation. Today the restriction is truly prohibitive. Of course, it must be recognized that while the legislature was making this improvement it was also engaged in removing a great many people from the competitive service and hence from under any restriction whatever upon their political activities." Litchfield, *Michigan's Experience with Civil Service,* 2 Personnel Administration (No 4) 1, 8 (1939).

four years of political maneuvering and legislative advance and retreat on the civil service system issue, the people of Michigan adopted a constitutional amendment establishing a constitutional state civil service system, superseding the 1939 legislation.[14] Conspicuously absent from the new constitutional amendment was the flat ban on all political activity which was included in the 1936 report and the 1939 legislation. The focus, instead, was upon the basic evils in state civil service under the spoils system and the ineffectual 1939 acts: appointments, promotions, demotions and discharge based upon partisan political considerations.[15]

Thus, when given the opportunity to speak directly to the issue of the rights and duties of state classified civil servants in the newly created constitutional civil service system, the people of Michigan showed no disposition to ban off-duty political activity.

Nevertheless, shortly after the adoption of the 1940 amendment, the Civil Service Commission enacted Rule 7, substantially in the form in which it exists today, prohibiting certain types of off-duty political activity. In effect, the commission re-enacted much of the flat ban on such activity recommended in the 1936 report and included in the 1939 statute. Almost immediately, the Attorney General issued an opinion holding that the

---

[14] Const 1908, art 6, § 22, effective January 1, 1941. See *Reed v Civil Service Comm*, 301 Mich 137; 3 NW2d 41 (1942).

[15] "No person shall be appointed to or promoted in the state civil service who has not been certified as so qualified for such appointment or promotion by the commission. No removals from or demotions in the state civil service shall be made for partisan, racial, or religious considerations." Const 1908, art 6, § 22.

commission lacked the authority to enact such a rule.[16]

In 1963, the people adopted an entirely new Constitution which retained essentially the same provisions contained in the 1940 amendment concerning the state civil service system:

"No person shall be appointed to or promoted in the classified service who has not been certified by the commission as qualified for such appointment or promotion. No appointments, promotions, demotions or removals in the classified service shall be made for religious, racial or partisan considerations." Const 1963, art 11, § 5.

Like the prior constitutional provision, the 1963 document contains no ban on partisan political activity, either on or off the job.

The Attorney General's opinion to the contrary notwithstanding, the prohibitions of Rule 7 apparently have continued "on the books" for nearly 30 years and, until now, have gone unchallenged.

Despite the absence of any express prohibition against off-duty political activity to be found anywhere in the 1940 amendment or its 1963 successor, the defendant contends that the "plain language" of the fourth paragraph of art 11, § 5˙ is a grant of plenary power over state classified civil servants authorizing regulation of off-duty political activity. We set it forth once again for ease of reference:

---

[16] "It is the opinion of this department that the Civil Service Commission is without authority to make any rules and regulations regarding political activity of those in state civil service outside of their hours of employment any more than it has the right to regulate a man working in his garden or on the farm after hours.

"Some states provided in their constitutional amendment that no person under state civil service would be permitted to engage in any political activity, but the framers of this amendment did not see fit to do so nor to authorize the commission that it created, to do so." OAG, 1941-1942, No. 19620, p 112 (April 9, 1941).

"The commission shall classify all positions in the classified service according to their respective duties and responsibilities, fix rates of compensation for all classes of positions, approve or disapprove disbursements for all personal services, determine by competitive examination and performance exclusively on the basis of merit, efficiency and fitness the qualifications of all candidates for positions in the classified service, *make rules and regulations covering all personnel transactions, and regulate all conditions of employment in the classified service.*" (Emphasis added.)

We are persuaded that neither the history of the adoption of a civil service system in Michigan, including as it does the voice of the people expressed indirectly through the Legislature in 1937 and 1939 and directly in the 1940 constitutional amendment and the 1963 Constitution, nor a common-sense reading of the "plain language" of art 11, § 5, interpreted according to familiar rules of constitutional construction, support the defendant's claim of authority to regulate, indeed prohibit, any off-duty political activity by state classified employees.

From a purely historical perspective, had it been the intention of the voters of this state in 1940 to cede to the newly created civil service commissioners the power to deny to thousands of citizens the dearly won fundamental right to exercise, off-duty, the personal freedoms of speech and expression inherent in participation in the political process, we think they would have said so clearly. The constitutional disenfranchisement of thousands of civil servants from a participating role in the democratic process, taking away with one constitutional hand (art 11, § 5) the political freedoms given with the other (art 1), would have called for plain, simple and direct language. The 1940 voters were people immediately witness to the public

sentiments which generated the 1936 report rec-
ommending a flat ban on all political activity, the
1937 legislative action which enacted a civil ser-
vice law which contained no such prohibition, and
the 1939 acts which emasculated the new civil
service system but enacted the total ban. They
were sufficiently interested in the subject to take
the matter entirely out of legislative hands by
adopting the 1940 constitutional amendment. They
were voters only slowly emerging from the black-
est days of a devastating economic depression. A
job was a preciously valued opportunity, hard to
come by, and government service was the only
hope of many for work. Many believed, whether
justifiably or not, that government policies and
abuse of the political process were largely respon-
sible for the hunger, unemployment and poverty of
millions. Freedom of political expression and par-
ticipation in the political process to assure more
effective government was seen by many as the
only hope for recovery. Had the 1940 voters a
mind to do so, they were particularly capable of
declaring in "plain language" that civil servants
must forfeit active off-duty participation in the
political process as the price of public employment
in the classified service. They could have done so
simply by adopting the language of the 1936 re-
port, as indeed their representatives in the Legis-
lature had done two years earlier. Their failure to
do so by adopting the 1940 amendment without
such a provision is strongly suggestive of a knowl-
edgeable rejection of such a ban.

Of greater significance, however, is the "plain
language" of art 11, § 5 itself. While the history of
civil service in Michigan is instructive, it is our
interpretation of the constitutional language in
question, *more precisely the meaning we think it*

*had for the people who adopted it,* that governs, in the last analysis, our determination that it is not a grant of authority for the adoption of Rule 7.

In *Traverse City School Dist v Attorney General,* 384 Mich 390, 405-406; 185 NW2d 9 (1971), this Court addressed the matter of interpreting constitutional language:

"The primary rule is the rule of 'common understanding' described by Justice COOLEY:

"'A constitution is made for the people and by the people. *The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves would give it.* "For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, *the intent to be arrived at is that of the people,* and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, *but rather that they have accepted them in the sense most obvious to the common understanding,* and ratified the instrument in the belief that that was the sense designed to be conveyed." (Cooley's Const Lim 81).'" (Emphasis in *Traverse City School Dist.)*

\* \* \*

"A second rule is that to clarify meaning, the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished may be considered. On this point this Court said the following:

"'In construing constitutional provisions where the meaning may be questioned, the court should have regard to the circumstances leading to their adoption and the purpose sought to be accomplished.' *Kearney v Board of State Auditors,* 189 Mich 666, 673 [155 NW 510] (1915).

"A third rule is that wherever possible an interpretation that does not create constitutional invalidity is preferred to one that does."

A grant of power to an administrative agency to pervasively curtail the political freedoms of thousands of citizens should not be easily inferred from a constitutional provision so facially devoid of any such language. Certainly we cannot conclude, with any degree of confidence, that "the great mass of the people themselves would" understand the language of art 11, § 5, upon which defendants rely, to be a grant of power to defendants to forbid off-duty political activity.

We cannot say that the meaning given this language by defendant in Rule 7 is the meaning the people had in mind as "obvious to the common understanding". To construe the language of § 5 of art 11 as a grant of power to curtail political freedom of speech and association, at home, off-duty, would indeed assign to the words used a "dark [and] abstruse meaning".

The power to make "rules and regulations covering all personnel transactions, and regulate all conditions of employment in the classified service" is indeed a plenary grant of power. But it is to be exercised with respect to determining the conditions "*of* employment", not conditions *for* employment. As the learned trial court so aptly put it:

"It is the purpose of the commission to keep politics out of the classified state service, not to keep classified employees out of politics."

We do not question the commission's authority to regulate employment-related activity involving internal matters such as job specifications, compensation, grievance procedures, discipline, collective bargaining and job performance, including the power to prohibit activity during working hours which is found to interfere with satisfactory job

performance. This Court has said as much in *Viculin v Dep't of Civil Service,* 386 Mich 375; 192 NW2d 449 (1971). The Court has also recognized the commission's power to regulate and even prohibit off-duty activity which is found to interfere with job performance. See *Groehn v Corporation & Securities Comm,* 350 Mich 250; 86 NW2d 291 (1957), and *MacLellan v Dep't of Corrections,* 373 Mich 448; 129 NW2d 861 (1964).

That power does not extend, however, to the blanket prohibition of off-duty activities, political or otherwise, as a matter of policy simply because such activities may conceivably interfere with satisfactory job performance. What an employee does during his off-duty hours is not of proper concern to the Civil Service Commission unless and until it is shown to adversely affect job performance. Even then the commission's authority is not to curtail the off-hours activity, it is to deal with the adequacy of job performance. Certainly, it is within contemplation that off-duty political involvement may adversely affect a classified employee's performance at work. If and when it does, the commission is empowered to deal with such circumstances on a case-by-case basis. See *Groehn v Corporation & Securities Comm, supra.*

It is no answer to say, as defendant does, that:

"It is difficult to prove that employment decisions are motivated by political considerations. Because of this, the Civil Service Commission has determined that specific restrictions against certain kinds of political activity are essential in order to assure that job decisions are made on the basis of merit and performance rather than on the basis of political preference. It is also difficult if not impossible to prove that the political activity of any individual employee impacts on job performance." Appellants' Brief, p 16.

The "difficulty" of proving that promotion, demotion and discharge are based on loyalty or enmity related to off-duty political activity and not merit is an argument for strengthening the testing and evaluating procedures and the establishment of more satisfactory objective criteria for job performance, not eliminating the constitutionally guaranteed personal freedoms of the employee.

Presumably it would be difficult to prove that off-duty religious practices and affiliations impact on employment decisions and job performance, but that would hardly be warrant for banning employee participation in such activities.

We do not wish to be understood as qualifying in any way this Court's earlier holding that

"the Civil Service Commission by [the constitutional grant of authority] is vested with plenary powers in its *sphere of authority.*" (Emphasis added.) *Plec v Liquor Control Comm,* 322 Mich 691; 34 NW2d 524 (1948).

Since that grant of power is from the Constitution, any executive, legislative or judicial attempt at incursion into that "sphere" would be unavailing. We intend, rather, to be understood as emphasizing that the commission's "sphere of authority" delimits its rule-making power and confines its jurisdiction over the political activity of classified personnel to on-the-job behavior related to job performance.

In sum, there is no provision in our Constitution which plainly, or by fair implication, empowers the Civil Service Commission to regulate the off-duty political activity of classified civil servants as attempted by Rule 7, or in any manner preemptively conflicts with the power of the Legislature to enact 1976 PA 169. The statute does not conflict

with the Civil Service Commission's authority to regulate, indeed proscribe, on-duty political activity or deal with unsatisfactory job performance attributable to off-duty political activity or any other cause on a case-by-case basis.[17]

We hold that 1976 PA 169 is a valid exercise of legislative authority, offends no provision of the Michigan Constitution, and is applicable to employees in the state classified civil service.

In view of the invalidity of Rule 7 for the reasons stated, we decline to reach the constitutional issue framed in the second question of the order granting leave to appeal.

The decision of the Court of Appeals is affirmed.

COLEMAN, C.J., and KAVANAGH, WILLIAMS, LEVIN, FITZGERALD, and BLAIR MOODY, JR., JJ., concurred with RYAN, J.

---

[17] As to on-duty political activity, 1976 PA 169, § 4 states:

"The activities permitted by sections 2 and 3 shall not be actively engaged in by a public employee during those hours when that person is being compensated for the performance of that person's duties as a public employee."