STRAUS v GOVERNOR

Docket No. 204457. Submitted January 6, 1998, at Lansing. Decided June 9, 1998, at 9:00 A.M. Leave to appeal granted, 458 Mich 865.

Kathleen N. Straus and three other members of the State Board of Education brought an action in the Ingham Circuit Court against the Governor, seeking declaratory and injunctive relief against the implementation of Executive Order Nos. 1996-11 and 1996-12. The executive orders make the Superintendent of Public Instruction the head of the Department of Education by transferring from the board to the superintendent most of the board's statutory administrative powers, duties, functions, and responsibilities. The court, Carolyn Stell, J., granted summary disposition for the plaintiffs and permanently enjoined the implementation of the executive orders. The court concluded that the orders violate Const 1963, art 8, § 3, which vests the board with leadership and general supervision over public education, and exceed the Governor's authority under Const 1963, art 5, § 2 to reorganize the executive branch of state government. The Governor appealed.

The Court of Appeals *held*:

The executive orders do not infringe the board's constitutional powers or prerogatives and are within the scope of the Governor's constitutional authority to reorganize the executive branch of state government.

1. The diminution in the plaintiffs' collective influence and power that will result upon the implementation of the executive orders confers on the plaintiffs standing to bring an action that challenges the validity of the executive orders.

2. The Governor's constitutional power to reorganize the executive branch of state government is nearly plenary and includes the authority to delegate, assign, or transfer existing power, responsibility, or authority within, among, or across the executive departments. The board, although created and vested by the constitution with five specific functions, is nevertheless part of the executive branch and subject to the Governor's power of reorganization.

3. The executive orders, in transferring only statutory powers and duties, leave unaffected the board's constitutional powers and

duties, including its ability to provide leadership and general supervision over public education.

Reversed; judgment of no cause of action granted to Governor.

FITZGERALD, P.J., concurring in part and dissenting in part, stated that the board is part of the executive branch of state government, that the executive orders infringe the board's powers under Const 1963, art 8, § 3, and that the executive orders are not within the scope of the Governor's authority under Const 1963, art 5, § 2 to reorganize the executive branch. The board is constitutionally empowered, as part of its function of providing leadership and supervision over public education, to head the Department of Education. The executive orders, by making the superintendent the head of the department, infringe the board's constitutional powers. The Governor has constitutional authority to reorganize legislatively created executive departments, boards, and commissions, but not constitutionally created departments, boards (such as the State Board of Education), and commissions. The executive orders are not within the scope of the Governor's authority over executive reorganization.

1. CONSTITUTIONAL LAW — GOVERNOR — EXECUTIVE REORGANIZATION.

The Governor's power under the state constitution to reorganize the executive branch of state government is nearly plenary; the Governor may delegate, assign, or transfer existing power, responsibility, or authority within, among, or across the executive departments (Const 1963, art 5, § 2).

2. CONSTITUTIONAL LAW — ACTS — EXECUTIVE ORDERS — FACIAL CHALLENGES.

A party who challenges an act or executive order as being unconstitutional on its face must establish that no set of circumstances exists under which the act or executive order would be valid; the fact that the act or executive order might operate unconstitutionally under some set of circumstances is insufficient.

3. CONSTITUTIONAL LAW — EXECUTIVE REORGANIZATION — STATE BOARD OF EDUCATION — SUPERINTENDENT OF PUBLIC INSTRUCTION.

Executive orders by which the Governor made the Superintendent of Public Instruction the head of the Department of Education in place of the State Board of Education by transferring to the superintendent the board's statutory administrative duties, functions, and responsibilities do not infringe the board's constitutionally vested authority to lead and generally supervise all public education (Const 1963, art 5, § 2, art 8, § 3; Executive Order Nos. 1996-11, 1996-12).

*Mark H. Cousens, Sachs, Waldman, O'Hare, Helveston, Bogas & McIntosh, P.C.* (by *Mary Ellen Gurewitz*), and *White, Przybylowicz, Schneider & Baird, P.C.* (by *Arthur R. Przybylowicz*), for the plaintiffs.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Thomas R. Wheeker*, Assistant Attorney General, for the defendant.

Before: FITZGERALD, P.J., and O'CONNELL and WHITBECK, JJ.

O'CONNELL, J. In this appeal of right, plaintiffs, elected members of the State Board of Education (hereafter the board), challenge, as being in excess of the authority vested in the Governor by Const 1963, art 5, § 2, and as being in derogation of the board's inherent constitutional prerogatives under Const 1963, art 8, § 3, the actions of the Governor in promulgating Executive Order Nos. 1996-11 and 1996-12. These orders transfer various powers of the board to the Superintendent of Public Instruction. The Ingham Circuit Court agreed with plaintiffs' contentions, and, on cross-motions for summary disposition, MCR 2.116(C)(8) and (10), issued a declaratory judgment and permanent injunction against the implementation of these orders. We reverse.

I. FACTS AND BACKGROUND INFORMATION

The facts in this matter are not in dispute. On December 19, 1996, the Governor issued Executive Order No. 1996-11, which transferred "all of the administrative statutory powers, duties, functions and responsibilities" of the board to the superintendent by

a "Type II transfer."[1] In effect, Executive Order No. 1996-11 made the superintendent, rather than the board, the administrative head of the Department of Education. This order was to become effective March 10, 1997.

Also on December 19, 1996, the Governor issued Executive Order No. 1996-12. Section 1 of this order transferred "all of the administrative statutory powers, duties, functions, and responsibilities" of the board, as set forth in approximately one hundred different sections of the Michigan Compiled Laws, to the superintendent by a "Type II transfer." Section 2 transferred "[a]ll of the statutory rule making powers, duties, functions, and responsibilities" of the board, as set forth in an additional approximately thirty-nine sections of the Michigan Compiled Laws, to the superintendent by a "Type II transfer." Section 3 stated that "all the statutory policy making powers, duties, functions, and responsibilities" of the board, as set forth in approximately thirty-six different sections of the Michigan Compiled Laws, "shall remain with the State Board of Education." Executive Order No. 1996-12 was to become effective July 1, 1997.

Given the nature of the case before us, we must take note of the limits of judicial competence in such matters. We cannot serve as political overseers of the executive or legislative branches, weighing the costs and benefits of competing political ideas or the wisdom of the executive or legislative branches in taking certain actions, but may only determine whether some constitutional provision has been violated by an

---

[1] Pursuant to MCL 16.103(b); MSA 3.29(3)(b), a "type II transfer" allows the transferring of an existing board to a principal department.

act (or omission) of the executive or legislative branch. As has been long recognized, when a court confronts a constitutional challenge it must determine the controversy "stripped of all digressive and impertinently heated veneer lest the Court enter—unnecessarily this time—another thorny and trackless bramblebush of politics." *Taylor v Dearborn Twp*, 370 Mich 47, 50, 51-52; 120 NW2d 737 (1963) (BLACK, J., joined by KAVANAGH, J.). Indeed, it is clear that issues of motive underlying the contested action are not justiciable. See also *Tenney v Brandhove*, 341 US 367, 376; 71 S Ct 783; 95 L Ed 1019 (1951) (noting that it is "not consonant with our scheme of government for a court to inquire into the motives of legislatures").

## II. STANDING

As a threshold matter, we address plaintiffs' standing to maintain this suit and our jurisdiction to issue injunctive relief against the Governor. Plaintiffs represent precisely one-half the membership of the State Board of Education. Voting as a bloc, plaintiffs have the ability to either determine the result of any matter coming before the board, by convincing one other member to join them, or to create an impasse if all other members of the board seek an opposite outcome. However, under Executive Order Nos. 1996-11 and 1996-12, plaintiffs' ability to forestall action by the board in the exercise of statutorily delegated powers is limited because the superintendent may act unilaterally (unless a majority of the board directs otherwise). This arguable diminution in plaintiffs' *collective* influence and official power suffices, in our view, to confer standing on them to pursue this challenge. *House Speaker v State Administrative Bd*, 441

Mich 547, 556; 495 NW2d 539 (1993); see also *Raines v Byrd*, ___ US ___; 117 S Ct 2312, 2319; 138 L Ed 2d 849 (1997).

We would also note that, because a court at all times is required to question sua sponte its own jurisdiction (whether over a person, the subject matter of an action, or the limits on the relief it may afford), *Fox v Univ of Michigan Bd of Regents*, 375 Mich 238, 242; 134 NW2d 146 (1965), we have some doubt with respect to the propriety of injunctive relief against the Governor. It is clear that separation of powers principles, Const 1963, art 3, § 2, preclude mandatory injunctive relief, mandamus, against the Governor. *People ex rel Sutherland v Governor*, 29 Mich 320; 18 Am Rep 89 (1874). Whether similar reasoning also puts prohibitory injunctive relief beyond the competence of the judiciary appears to be an open question that need not be resolved in this case. We do note that the Supreme Court has recently recognized that declaratory relief normally will suffice to induce the legislative and executive branches, the principal members of which have taken oaths of fealty to the constitution identical to that taken by the judiciary, Const 1963, art 11, § 1, to conform their actions to constitutional requirements or confine them within constitutional limits. *Durant v Michigan*, 456 Mich 175, 205; 566 NW2d 272 (1997). Only when declaratory relief has failed should the courts even begin to consider additional forms of relief in these situations. *Id.* at 206. The need for utmost delicacy on the part of the judiciary, and respect for the unique office of Governor, was similarly recognized in *People ex rel Johnson v Coffey*, 237 Mich 591, 602; 213 NW 460 (1927):

The governor holds an exalted office. To him, and to him alone, a sovereign people has committed the power and the right to determine the facts in the proceeding before us. His decision of disputed question of fact is final. His finding of fact, if it has evidence to support it, is conclusive on this court. It would be unbecoming in us to impugn his motives, and unseemly and unlawful to invade his discretion.

### III. STANDARD OF REVIEW

This case is before us on cross-motions for summary disposition, MCR 2.116(C)(8) and (10). We review a trial court's ruling on a motion for summary disposition de novo. *G & A Inc v Nahra*, 204 Mich App 329, 330; 514 NW2d 255 (1994). Indeed, summary disposition under either MCR 2.116(C)(8) or (10) will always present an issue of law for our determination. *Nahra, supra* at 330.

### IV. ANALYSIS

When reviewing constitutional provisions, the objective of such review is to effectuate the intent of the people who adopted the constitution. *Livingston Co v Dep't of Management & Budget*, 430 Mich 635, 641-642; 425 NW2d 65 (1988). The lodestar principle is that of "common understanding," the sense of the words used that would have been most obvious to those who voted to adopt the constitution.[2] *House*

---

[2] Both sides have cited portions of the "Address to the People" and the record of the Constitutional Convention, both of which may properly be considered in interpreting constitutional provisions. *Bingo Coalition for Charity—Not Politics v Bd of State Canvassers*, 215 Mich App 405, 410; 546 NW2d 637 (1996). However, nowhere was this precise issue considered or discussed, and what remains is too ambiguous and short-lived to serve as a reliable basis for resolution of the issue confronting us, particularly when the constitutional phraseology at issue is, in our view, straightforward in meaning and application on the record before us. See *Doe v Dep't of Social Services*, 439 Mich 650, 672-674; 487 NW2d 166 (1992).

*Speaker v Governor*, 443 Mich 560, 577; 506 NW2d 190 (1993). Where, as here, there is a claim that two different provisions of the constitution collide, we must seek a construction that harmonizes them both. This is so because, both having been adopted simultaneously, neither can logically trump the other. *Kunzig v Liquor Control Comm*, 327 Mich 474, 480-481; 42 NW2d 247 (1950).

The Governor's power under Const 1963, art 5, § 2, as has been noted, is nearly plenary.[3] In the absence of a legislative veto within sixty days during a regular session (or a full regular session of shorter duration), the Governor, by executive order submitted to the Legislature, may make changes in the organization of the executive branch or in the assignment of functions among its units that the Governor considers necessary for efficient administration. This power

---

[3] Const 1963, art 5, § 2 provides:

All executive and administrative offices, agencies and instrumentalities of the executive branch of state government and their respective functions, powers and duties, except for the office of governor and lieutenant governor and the governing bodies of institutions of higher education provided for in this constitution, shall be allocated by law among and within not more than 20 principal departments. They shall be grouped as far as practicable according to major purposes.

Subsequent to the initial allocation, the governor may make changes in the organization of the executive branch or in the assignment of functions among its units which he considers necessary for efficient administration. Where these changes require the force of law, they shall be set forth in executive orders and submitted to the legislature. Thereafter the legislature shall have 60 calendar days of a regular session, or a full regular session if of shorter duration, to disapprove each executive order. Unless disapproved in both houses by a resolution concurred in by a majority of the members elected to and serving in each house, each order shall become effective at a date thereafter to be designated by the governor.

includes the authority to delegate, assign, or transfer existing power, responsibility, or authority within, among, or across not more than twenty principal departments. The Governor's power is limited only by constitutional provisions that would inhibit the Legislature itself. *House Speaker v Governor, supra* at 578-579; *Morris v Governor (On Remand, After Remand)*, 214 Mich App 604, 608; 543 NW2d 363 (1995). Because the Governor's action has the status of enacted legislation, it is entitled to the same presumption of constitutionality that an equivalent statute would enjoy. Therefore, the judiciary should construe the executive orders as constitutional unless unconstitutionality clearly appears. *Mahaffey v Attorney General*, 222 Mich App 325, 344; 564 NW2d 104 (1997) (statutes should be construed as constitutional unless unconstitutionality is clearly apparent).

The board is a constitutional authority, empowered with "[l]eadership and general supervision over all public education, including adult education and instructional programs in state institutions, except as to institutions of higher education granting baccalaureate degrees." Const 1963, art 8, § 3.[4] The board serves "as the general planning and coordinating body

---

[4] Const 1963, art 8, § 3 provides, in part:

Leadership and general supervision over all public education, including adult education and instructional programs in state institutions, except as to institutions of higher education granting baccalaureate degrees, is vested in a state board of education. It shall serve, as the general planning and coordinating body for all public education, including higher education, and shall advise the legislature as to the financial requirements in connection therewith.

The state board of education shall appoint a superintendent of public instruction whose term of office shall be determined by the board. He shall be the chairman of the board without the right to vote, and shall be responsible for the execution of its policies. He

for all public education, including higher education," and as advisor to "the legislature as to the financial requirements in connection therewith." Const 1963, art 8, § 3, cl 1. The board consists of eight members nominated by party conventions and elected at large for terms of eight years as prescribed by law. *Id.*, § 3, cl 3. The superintendent is appointed by the board, serves as its chairperson, but without voting rights, and is imbued by the constitution with responsibility for execution of board policies. *Id.*, § 3, cl 2. The Governor serves as an ex-officio member of the board, without the right to vote. *Id.*, § 3, cl 3. As are all such administrative agencies, the board is part of the executive branch of government.[5] *Judges of the 74th Judicial Dist v Bay Co*, 385 Mich 710, 727; 190 NW2d 219 (1971).

Nonetheless, plaintiffs contend that the board is not part of or within the executive branch. In this regard, we note that Const 1963, art 3, § 2 provides that the powers of government are divided into three branches: legislative, executive, and judicial. In *Federated Publications v Michigan State Univ Bd of Trustees*, 221 Mich App 103, 113; 561 NW2d 433 (1997), we dealt with a somewhat similar argument, to the effect that the Open Meetings Act, MCL 15.261 *et seq.*; MSA 4.1800(11) *et seq.*, does not apply to public universi-

---

shall be the principal executive officer of a state department of education which shall have powers and duties provided by law.

[5] Because members of the board are neither appointed nor directly overseen by the Legislature or the judiciary, the board must be part of the executive branch. There is no fourth branch of government. *Walker v Wolverine Fabricating & Mfg, Inc*, 425 Mich 586, 607; 391 NW2d 296 (1986); *Civil Service Comm v Auditor General*, 302 Mich 673, 682; 5 NW2d 536 (1942).

ties that were asserted to be "coequal branches of government." We responded unequivocally:

> We disagree. In *In re 1976 PA 267* [400 Mich 660; 255 NW2d 635 (1977)], the Court noted that the powers of government were divided among *three* branches of government pursuant to Const 1963, art 3, § 2. It further noted that the separation of powers set forth in the constitution was "designed to preserve the independence of the three branches of government." *Id.* at 662. Although various cases have stated that public universities are branches of government coequal with the Legislature, the constitution does not contain any provision that elevates them to a fourth branch of government. See *Walker v Wolverine Fabricating Mfg Co, Inc*, 425 Mich 586, 607; 391 NW2d 286 (1986). Because autonomous state universities have not achieved that status under the constitution, *In re 1976 PA 267* is inapplicable to this case. [*Federated Publications, supra* at 113-114 (emphasis in original).]

We apply the same reasoning here. The board is not a fourth branch of government. To so hold would be to directly contravene the plain meaning of Const 1963, art 3, § 2. Further, the board is not a part of the legislative or the judicial branch. Rather, the board is part of and within the executive branch, albeit as a constitutionally created entity with five specifically delineated, and therefore constitutionally inviolable, functions.[6] In this regard, the constitutional location of the board's functions within the executive branch is simi-

---

[6] These functions are (1) to exercise "[l]eadership and general supervision over all public education, including adult education and instructional programs in state institutions, except as to institutions of higher education granting baccalaureate degrees," (2) to serve "as the general planning and coordinating body for all public education, including higher education, before" (3) to "advise the legislature as to the final requirements in connection therewith," (4) to appoint the superintendent, and (5) to determine the term of office of the superintendent. Const 1963, art 8, § 3.

lar to that of the State Transportation Commission, under Const 1963, art 5, § 28, the Civil Rights Commission, under Const 1963, art 5, § 29, and the Civil Service Commission, under Const 1963, art 11, § 5.[7]

The constitution contains specific requirements relating to the Department of Education. Const 1963, art 8, § 3, cl 2 specifies that the superintendent "shall be the principal executive officer of a state department of education which shall have powers and duties provided by law." This must be read as some limitation on the Governor's generally plenary power under Const 1963, art 5, § 2, subject to veto by joint legislative resolution, to reorganize state government into not more than twenty principal departments. It may be logically concluded, given the fact that the Department of Education is specifically mentioned in the constitution, that the department is one of the twenty "principal departments."

---

[7] We note that the Civil Service Commission's functions are not set out in the article of Const 1963 dealing with the executive branch but in the article dealing with public officers and employment. However, in *Reed v Civil Service Comm*, 301 Mich 137, 152; 3 NW2d 41 (1942), the Michigan Supreme Court, in construing the 1941 amendment of Const 1908 that created the Civil Service Commission as a constitutional rather than a statutory entity, referred to "rights . . . affected by the arbitrary or unreasonable action of an *administrative* agency." (Emphasis supplied.) The logical repository for *administrative*, as compared to legislative or judicial, functions is in the executive branch. But see the concurrence of CHANDLER, C.J., joined by BUSHNELL, J:

Unquestionably the civil service commission is a constitutional body possessing plenary power. In its acts it is not subject to control or regulation by either [sic] the executive, legislative or judicial branch of our State government. [*Reed, supra,* at 163.]

See also *Viculin v Dep't of Civil Service*, 386 Mich 375, 385-386, n 11; 192 NW2d 449 (1971) (boards and commissions created throughout the constitution are administrative bodies); *Judges of the 74th Judicial Dist, supra* at 727 (administrative agencies are part of the executive branch of government.).

The parties do not suggest that the executive orders at issue engender a violation of the constitutional limitation to twenty principal departments. Similarly, the parties do not suggest that the Governor sought to implement such orders before the expiration of the constitutionally prescribed sixty regular legislative session days or a full regular session of shorter duration. Finally, the parties do not suggest that the Legislature, by concurrent resolution of a majority of the members elected to and serving in each house, disapproved either or both of the executive orders on the basis of a concern about the board's constitutional prerogatives or authority.

The executive orders at issue transfer a variety of statutory powers, both administrative and regulatory, from the board to the superintendent. Both orders explicitly provide:

> Nothing in this Executive Order should be construed to diminish the constitutional authority of the State Board of Education to provide leadership and general supervision over all public education, including adult education and instructional programs in state institutions, except as to institutions of higher education granting baccalaureate degrees, and its authority to serve as the general planning and coordinating body for all public education including higher education, and to advise the legislature as to the financial requirements in connection therewith. [Executive Order No. 1996-11, ¶ 2; Executive Order 1996-12, ¶ 5.]

Executive Order No. 1996-12 additionally specifies that the board "shall retain its policy making authority with regard to these statutory provisions by determining the policies, if any, on which the administration of these provisions shall be based."

The first factor critical to our determination is that the executive orders address only the powers and duties that are conferred upon the board by statute. Contrary to plaintiffs' assertion, the Governor did not transfer *constitutionally* granted functions from one executive branch agency, board, or entity to another. Const 1963, art 8, § 3 does not state that the board is to be the head of the Department of Education. Rather, this language is contained in § 301 of the Executive Organization Act of 1965, MCL 16.401; MSA 3.29(301).[8] Similarly, the functions transferred by Executive Order Nos. 1996-11 and 1996-12 were created by the Legislature through enactment of the relevant statutes, not by the people directly through adoption of Const 1963, art 8, § 5.[9]

---

[8] As noted by plaintiffs, Lieutenant and Acting Governor William Milliken in Executive Order No. 1965-19 (1) established the Department of Education in the executive branch, (2) established the state board as the head of the Department of Education, (3) established the superintendent as the principal executive officer of the Department of Education, and (4) stated that, "[T]he state board of education is hereafter responsible for carrying out the functions, duties, and responsibilities of the department of education in accordance with the constitution and the statutes of this state." As noted in *House Speaker, supra,* at 579, when the Governor makes changes within the executive branch through the executive order procedure, he has the authority, in effect, to enact laws to carry out those changes. See also *Morris, supra* at 612, quoting *House Speaker* to the effect that the Governor's reorganization powers are equal to the Legislature's initial and subsequent reorganization powers. Thus, we consider Lieutenant and Acting Governor William Milliken's actions in Executive Order No. 1965-19 to be equivalent to the Legislature's actions in § 301 of the Executive Organization Act of 1965.

[9] Executive Order No. 1996-11 transfers "administrative statutory powers, duties, functions and responsibilities" of the board. These "statutory powers" are found in MCL 16.401; MSA 3.29(301), MCL 16.107(a); MSA 3.29(7)(a), and MCL 16.109; MSA 3.29(9). Section 1 of Executive Order No. 1996-12 transfers approximately one hundred "administrative statutory powers, duties, functions, and responsibilities" of the board, as found in the relevant provisions of the Michigan Compiled Laws. Section 2 transfers the board's "statutory rule making powers, duties, functions, and responsibilities" as found in approximately thirty-nine provisions of the

Therefore, the board is not *constitutionally* required, as part of its function of providing leadership and general supervision over all public education, to head the Department of Education. We believe it axiomatic that the Governor may, under Const 1963, art 5, § 2, cl 2, alter the current scheme and vest that function in the superintendent. Because the Legislature could have delegated such powers to the superintendent *ab initio*, the Governor is free to redistribute those powers within the Department of Education in any manner in which the Legislature could have assigned such authority originally or by amendment. See *House Speaker, supra.*

We note that plaintiffs' counsel during oral argument appeared to concede that the Legislature could constitutionally *repeal* the sections of the statutes delineating the functions that Executive Order No. 1996-12 transferred. Counsel was unwilling to concede, however, that the Legislature could constitutionally *transfer* such functions away from the board. Clearly, plaintiffs are standing on unstable ground. Because the Legislature originally enacted these statutory provisions, there can be no constitutional bar to a later repeal. Equally clearly, such a repeal would not impinge upon the board's constitutional function of leadership and general supervision over public education.

We also believe it clear that the Legislature could constitutionally *transfer* functions that it had previously vested in the board. Indeed, we see no functional difference between a repeal of such functions

Michigan Compiled Laws. The statutory sections cited in Executive Order No. 1996-12 are simply too numerous to cite in this opinion.

and a transfer of such functions. Here, the transfers in question were accomplished by executive order rather than legislative action but, as noted above, under *House Speaker, supra,* and *Morris, supra,* when the Legislature allocates a function, the Governor may thereafter change that allocation through the exercise of the Governor's reorganization powers under Const 1963, art 5, § 2, cl 2. As *House Speaker, supra* at 579, specifically held:

> The constitution, then, specifically recognizes that, where the Governor feels compelled to make certain changes within the executive branch, he has authority, through the executive order procedure, in effect, to enact laws to carry out those changes. The only way to preclude such changes is through a properly supported legislative veto. *In other words, after the initial executive branch organization, the Governor's reorganization powers are equal to the Legislature's initial and subsequent reorganization powers.* [Emphasis added.][10]

Simply put, and as argued by the Governor, if the Legislature can place a *statutory* function within an executive branch agency, board, or entity, the Governor by executive order may transfer the function to another executive branch agency, board, or entity.[11]

---

[10] See also *Morris, supra* at 609:

[T]he Governor's reorganization powers are equal to the Legislature's *initial* as well as subsequent reorganization powers. *In other words, when the Governor acts under this constitutional provision by means of an executive order, and that order is not overturned by the Legislature, it is as if the Legislature had acted.* [First emphasis in original; second emphasis supplied.]

[11] The affidavits that plaintiffs Kathleen Straus and Barbara Roberts Mason submitted to the lower court do not alter our conclusion. We first note that these affidavits contain a mixture of fact and opinion. Secondly, and perhaps more importantly, while these affidavits describe the current

Plaintiffs also argue that contemporaneous legislative (i.e., the enactment of § 301 of the Executive Organization Act of 1965) and gubernatorial (i.e., the issuance of Executive Order No. 1965-9) actions constitute "understandings" that Const 1963, art 8, § 3 should be read as requiring the board to be the head of the Department of Education. We disagree. Rather, we regard these actions not as signaling a contemporaneous understanding that the constitution *requires* such an outcome but rather as expressing a policy determination that such an outcome was then desirable. Under Const 1963, art 3, § 2, we do not function as reviewers of such policy determinations, whether they are made by the legislative or executive branch, and we therefore express no opinion with respect to the wisdom, or lack thereof, of making the superintendent the head of the Department of Education. Rather, we hold that the constitution does not *require* that the board function in this capacity.[12]

By expressly declaring that the board may continue to set policies pursuant to which the superintendent shall carry out these various statutorily created responsibilities, the Governor has merely shifted legislatively delegated authority from the board to the

---

process by which the board carries out its *legislatively* derived functions, it does not logically follow that such functions are inherent to, and therefore inseparable from, the board's *constitutionally* derived functions. Therefore, we do not agree that these affidavits support a finding, advanced by plaintiffs, that the executive orders transferred "*all* powers which are a necessary incident of the Board's overarching power or duty to exercise leadership and general supervision of all public education in Michigan." (Emphasis supplied.)

[12] In this regard, we note that the Address to the People accompanying Const 1963, art 8, § 3 stated that "The superintendent would be considered as *administrative head* of a state department of education and as such would be a staff officer to the governor and on his administrative board." (Emphasis supplied.)

superintendent. In no perceptible way does this facially infringe any of the board's constitutional powers or prerogatives under Const 1963, art 8, § 3. Indeed, Executive Order No. 1996-12 specifically provides that the board shall *retain* its statutory *policymaking* powers, duties, functions, and responsibilities. Because the Governor has protected the ultimate authority of the board with apparent fidelity to Const 1963, art 8, § 3, no improper transfer of its powers or diminution of its ultimate responsibilities has occurred. See *Bays v Dep't of State Police*, 119 Mich App 719, 721-722; 326 NW2d 620 (1982) (no improper delegation of decision-making power of the Civil Service Commission where it retained "ultimate power over those decisions with which it is charged").

Our second major area of analysis concerns whether the Governor's actions divest the board of "control" over the system of public education in Michigan. We do not believe that the Governor has divested the board of ultimate control or that the Governor's actions limit that control in violation of Const 1963, art 8, § 3.

The party challenging the facial constitutionality of an act "must establish that no set of circumstances exists under which the [a]ct would be valid. The fact that the . . . [a]ct might operate unconstitutionally under some conceivable set of circumstances is insufficient . . . ." *United States v Salerno*, 481 US 739, 745; 107 S Ct 2095; 95 L Ed 2d 697 (1987). Further, "if any state of facts reasonably can be conceived that would sustain [an act], the existence of the state of facts at the time the law [or, here, an executive order] was enacted must be assumed." 16 Am Jur 2d, Constitutional Law, § 218, p 642. In addition, "[a] statute [or,

here, an executive order] may be constitutional
although it lacks provisions which meet constitutional
requirements, if it has terms not excluding such
requirements, and in this situation the court is justi-
fied in holding that the statute was intended to be
subject to such requirements, and that those require-
ments are to be considered as embodied in the stat-
ute." *Id.*, § 225, p 659.[13]

Here, Executive Order No. 1996-11 states that noth-
ing within it is to be construed to diminish the consti-
tutional authority of the board to provide leadership
and general supervision over all public education.
Thus, the terms of the executive order specifically
*include* the requirements of Const 1963, art 8, § 3.
Additionally, we can easily conceive of a state of
facts in which the superintendent exercises the
administrative functions of the head of the Depart-
ment of Education while the board continues to exer-
cise its leadership and general supervision over public
education. Indeed, construing Executive Order No.
1996-11 in its entirety, we conclude that this is what
the Governor intended. Executive Order No. 1996-11
basically involves the internal organization of the
Department of Education and, as such, would have
minimal effect on the functioning of the board. It
would also appear to be exactly the type of transfer
envisioned by Const 1963, art 5, § 2 and *House
Speaker, supra*. We do not discount the fact that the
superintendent, or his successor(s), could, conceiva-
bly and at some time in the future, encroach upon the
board's constitutionally granted functions. However,

---

[13] Quoted with approval in *Council of Organizations v Governor*, 455
Mich 557, 568-569; 566 NW2d 208 (1997).

unless and until such an encroachment actually occurs, the issue is not ripe for adjudication. *General Motors Corp v Attorney General*, 294 Mich 558, 568; 293 NW 751 (1940).

Similarly, we find no constitutional bar prohibiting the transfer of functions effectuated by Executive Order No. 1996-12. As noted above, this order transfers the *"administrative* statutory powers, duties, functions and responsibilities" of the board to the superintendent. Plaintiffs argue that these transfers directly affect the authority of the board and are not "concerned with the organization and powers of the Department of Education." However, plaintiffs have not established that there is no set of circumstances under which the transfers would be valid and we note that, as with Executive Order No. 1996-11, Executive Order No. 1996-12 states that nothing within it is to be construed to diminish the constitutional authority of the board to provide leadership and general supervision over all public education. Furthermore, as noted above, Executive Order No. 1996-12 explicitly provides that the board shall retain certain statutory policy-making powers and responsibilities.

In this respect, we note that there is no question that the board retains its constitutional authority to appoint the superintendent and to determine the superintendent's term of office and, by implication, this language suggests that the board also retains the power to shorten the term of office of the superintendent. The board also retains its statutory policy-making powers and its ability to provide "leadership and general supervision." These powers, retained by the board, certainly give the board authority over the superintendent and control over public education. We

therefore, under the facts before us, find that *ultimate* control remains with the board.

In conclusion, we do not believe that either Executive Order No. 1996-11 or Executive Order No. 1996-12 facially[14] infringes any of the board's constitutional powers or prerogatives under Const 1963, art 8, § 3. Given that the Governor has protected the board's ultimate authority over our educational system, we hold that the Governor has made no improper transfer of its powers or responsibilities. We further hold that the executive orders at issue are within the scope of the Governor's authority under Const 1963, art 5, § 2.

We reverse the decision of the circuit court and, pursuant to MCR 7.216(A)(7), grant a judgment of no cause of action in favor of the defendant. We also give this decision immediate effect pursuant to MCR 7.215(E)(2). We do not retain jurisdiction. No taxable costs pursuant to MCR 7.219, a question of public significance being involved.

WHITBECK, J., concurred.

FITZGERALD, P.J. (*concurring in part and dissenting in part.*) I concur with the majority's conclusion that the State Board of Education is within the executive

---

[14] We are not blind to the possibility that the superintendent could exceed these boundaries. However, we have no reason to anticipate that such a public officer will engage in *ultra vires* actions. Furthermore, on proper complaint, the judiciary will inquire into the matter and, if the board's constitutional prerogatives have been invaded, redress the infringement. Until such time, no such issue is ripe for adjudication. *United Public Workers of America (CIO) v Mitchell*, 330 US 75, 89-91; 67 S Ct 556; 91 L Ed 754 (1947); *General Motors, supra* at 568. Where a constitutional question is presented anticipatorily, the Court is required by the limits on its authority to decline to rule. *Sullivan v Bd of Dentistry*, 268 Mich 427, 429-430; 256 NW 471 (1934).

branch of government. I disagree, however, with the majority's conclusion that Executive Order Nos. 1996-11 and 1996-12 do not infringe the board's constitutional powers under Const 1963, art 8, § 3, and that the executive orders at issue are within the scope of the Governor's authority under Const 1963, art 5, § 2.

## FACTS

The facts in this matter are not in dispute. On December 19, 1996, the Governor issued Executive Order No. 1996-11, which transferred "[a]ll of the administrative statutory powers, duties functions and responsibilities" of the State Board of Education "as administrative head of the Department of Education" to the superintendent of Public Instruction by a "Type II transfer." In effect, Executive Order No. 1996-11 made the superintendent, rather than the board, the head of the Department of Education. Executive Order No. 1996-11 was to become effective March 10, 1997.

Also on December 19, 1996, the Governor issued Executive Order No. 1996-12, which purported to transfer "[a]ll of the administrative statutory powers, duties, functions, and responsibilities" of the board to the superintendent by a "Type II transfer." Under Executive Order No. 1996-12, the board retained only "statutory policy making powers, duties, functions, and responsibilities." Executive Order No. 1996-12 was to become effective July 1, 1997.

On March 3, 1997, plaintiffs instituted an action in the lower court to enjoin enforcement of Executive Order Nos. 1996-11 and 1996-12. Plaintiffs alleged that the executive orders violated Const 1963, art 8, § 3 on the ground that the constitution vested the board

with the authority to decide whether to exercise directly or to delegate the various statutory powers, responsibilities, and duties. Plaintiffs further alleged that art 8, § 3 limits any power of the Governor to transfer powers, responsibilities, and duties of the board.

On March 7, 1997, the lower court issued a preliminary injunction against implementation of Executive Order No. 1996-11, but denied a preliminary injunction against implementation of Executive Order No. 1996-12 on the ground that there was no immediate harm threatened by that executive order because it was not to go into effect until July 1, 1997. The parties thereafter filed cross-motions for summary disposition. On May 29, 1997, the lower court issued its oral opinion on these cross-motions. The lower court stated in part:

> The 1963 constitution reflects a clear change from a popularly elected superintendent with general supervisor [sic] powers, and a State Board with limited supervisory powers to a State Board with general supervisory powers over all public education, except as to institutions of higher education granting baccalaureate degrees; and a superintendent appointed by the Board to act as the non-voting chairperson of the board and to be the principal executive officer of a State Department of Education with powers and duties provided by law.

*  *  *

> The constitution impliably (sic) provides for the State Board to be the head of the Department of Education. To determine otherwise would reduce the State Board's constitutional authority over education to a nullity.

*  *  *

I would note that the statement in each of the executive orders at issue here that they do not affect the State Board's constitutional role, would be comparable to the legislature passing a statute and adding a sentence at the end of the statute is not unconstitutional [sic]. You cannot determine the constitutional role of the State Board simply by adding a sentence in an executive order.

What this case is not about is whether the governor has the power to reorganize the executive branch of government. *Housespeaker* [sic] *v Governor* [443 Mich 560; 506 NW2d 190 (1993)] and *Morris v Governor* [(*On Remand, After Remand*), 214 Mich App 604; 543 NW2d 363 (1995)] speak clearly on that issue.

This case is about whether the governor can use his reorganization power in a way which deprives the popularly elected State Board of Education of some or all of its constitutional authority. *Housespeaker* [sic] and *Morris* do not address this issue. Those cases focused on the interplay between executive orders implementing reorganization of the executive branch and the legislature's initial and subsequent power to reorganize the executive branch.

\*　　\*　　\*

. . . [T]his Court is bound by the Supreme Court's broad and expansive interpretation of the constitutional powers vested in a popularly elected State Board of Education. These executive orders represent an unconstitutional transfer of the State Board's authority, power and responsibility to the state superintendent. The governor's judicially recognized powers to reorganize the executive branch do not extend this far.

The June 16 order, presumably issued pursuant to this oral opinion, stated:

[A]s the Mich Const of 1963 provides for the State Board of Education to serve in a leadership and general supervision capacity over all public education in Michigan, the State Board of Education necessarily must serve as the head of the Department of Education, and the attempted

transfer of powers, responsibilities, and duties contained in Executive Orders 1996-11 and 1996-12 are contrary to and violate art 8, § 3 of Mich Const of 1963.

Because the lower court's order was based on a grant of summary disposition, this Court's review is de novo. *Coleman-Nichols v Tixon Corp*, 203 Mich App 645, 650; 513 NW2d 441 (1994).

## I. CONSTITUTIONAL CONSIDERATIONS

### A. EXECUTIVE BRANCH REORGANIZATION: CONST 1963, ART 5, § 2

Const 1963, art 5, § 2 provides:

All executive and administrative offices, agencies and instrumentalities of the executive branch of state government and their respective functions, powers and duties, except for the office of governor and lieutenant governor and the governing bodies of institutions of higher education provided for in this constitution, shall be allocated by law among and within not more than 20 principal departments. They shall be grouped as far as practicable according to major purposes.

Subsequent to the initial allocation, the governor may make changes in the organization of the executive branch or in the assignment of functions among its units which he considers necessary for efficient administration. Where these changes require the force of law, they shall be set forth in executive orders and submitted to the legislature. Thereafter the legislature shall have 60 calendar days of a regular session, or a full regular session if of shorter duration, to disapprove each executive order. Unless disapproved in both houses by a resolution concurred in by a majority of the members elected to and serving in each house, each order shall become effective at a date thereafter to be designated by the governor.

Art 5, § 2 confers two distinct types of power on the Governor. The first is the power to "make changes in the organization of the executive branch." The second

is the power to "make changes in the . . . assignment of functions among its units." Both powers are at issue in this matter.

### B. LEADERSHIP AND GENERAL SUPERVISION OVER PUBLIC EDUCATION: CONST 1963, ART 8, § 3.

#### 1. LANGUAGE

Const 1963, art 8, § 3 provides in pertinent part:

> Leadership and general supervision over all public education, including adult education and instructional programs in state institutions, except as to institutions of higher education granting baccalaureate degrees, is vested in a state board of education. It shall serve as the general planning and coordinating body for all public education, including higher education, and shall advise the legislature as to the financial requirements in connection therewith.
>
> The state board of education shall appoint a superintendent of public instruction whose term of office shall be determined by the board. He shall be the chairman of the board without the right to vote, and shall be responsible for the execution of its policies. He shall be the principal executive officer of a state department of education which shall have powers and duties provided by law.

Art 8, § 3 therefore vests five functions in the board. They are:

(a) Exercising "[l]eadership and general supervision over all public education, including adult education and instructional programs in state institutions, except as to institutions of higher education granting baccalaureate degrees."[1]

---

[1] The exception relating to institutions of higher education granting baccalaureate degrees, not being relevant to this opinion, will not be further referred to in this opinion.

(b) Serving as the general planning and coordinating body for all public education including higher education.

(c) Advising the Legislature as to the financial requirements in connection with public education.

(d) Appointing the superintendent.

(e) Determining the term of office of the superintendent.

At issue in this case is the first of these functions, providing "leadership and general supervision" over all public education.

## 2. HISTORY

As pointed out by plaintiffs, the Northwest Ordinance of 1787 provided that "[r]eligion, morality and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." Northwest Ordinance of 1787, art 3. Consistent with this declaration, every Michigan constitution has provided for statewide supervision over public education.

Accordingly, Const 1835, art 10, § 1 provided for a Superintendent of Public Instruction, to be appointed by the Governor, "whose duties shall be prescribed by law." Const 1850, art 8, § 1 provided for the popular election of a Superintendent of Public Instruction who, under art 13, § 1, "shall have the general supervision of public instruction, and his duties shall be prescribed by law." Const 1850, art 13, § 9 also created an elected board charged with general supervision over the state normal school and other duties "prescribed by law." Const 1908, art 11, § 2 also provided for the popular election of the Superintendent of Public Instruction, giving him the responsibility for

"general supervision of public instruction in the state"; Const 1908, art 11, § 6 also continued the limitation on the role of the elected board to supervision of the state normal college and the state normal schools and to such duties "prescribed by law."

Const 1963, art 8, § 3 substantially changed the roles of the board and the superintendent. No longer were the functions of the board to be solely "prescribed by law"; rather, as outlined above, art 8, § 3 constitutionally recognized five functions of the board. Delegate George Romney, a member of the Education Committee, explained this change to the convention:

> The third thing it does is to enlarge the functions of the board. The new board of education is given leadership and supervision over education other than colleges and universities. This means the elementary and secondary schools as well as other institutions of an educational character. The third thing it does is to give this board overall planning and coordinating responsibility for all of education. This we have not had. . . . It gives this board the key position in recommending to the governor and the legislature all the steps taken to meet our educational needs in the state.
>
> . . . In connection with the enlargement of the board's activities, I think it is important to know that this enlargement of the board's activities does not increase the authority of the board beyond that now granted in the present constitution to the superintendent of public instruction. The present constitution gives the superintendent of public instruction very broad authority over education, but he is not properly equipped either from the standpoint of staff and department or from the standpoint of ability to cover the full field to discharge that function. This contemplates the establishment of this board with these broad functions and certainly, this provides a more suitable means of dis-

charging these important functions. [1 Official Record, Constitutional Convention 1961, p 1190.][2]

### C. CONSTRUING CONST 1963[3]

#### 1. ORIGINAL INTENT, COMMON UNDERSTANDING, AND CONTEMPORANEOUS CONSTRUCTION

The Michigan Supreme Court has long held that the constitution must be interpreted in light of the original intent and understanding of its drafters. See, e.g., *People v DeJonge (After Remand)*, 442 Mich 266, 274; 501 NW2d 127 (1993); *Committee for Constitutional Reform v Secretary of State*, 425 Mich 336, 342; 389 NW2d 430 (1986). The framers' intent must be understood in conjunction with the intentions and understanding of the constitution held by its ratifiers.

---

[2] See also the comments of Delegate D. Hale Brake, emphasized by plaintiffs:

> That being true, the governor being a politician, as a governor must be a politician, the other members of the board being professional educators, as they should be, my first premise is that the 8 members of the board should lay down the policy to be followed by this board. *They should make the decisions. They know what the problems are. They should be the dominant force.*
>
> It seems to me that while Mr. Romney didn't say so that one of the principal objectives in the set up that has been suggested to us here is that of moving the department of education a little bit further away from the political arena. The board is elective. They pick the superintendent of public instruction instead of having him elected by the people as in the past. Then the committee turns right around and comes right straight back toward the political arena by putting the chief politician of the state on the board.
>
> My first premise is that *the board ought to run this show.* [1 Official Record, Constitutional Convention 1961, p 1193 (emphasis supplied).]

[3] It has been said that in construing a constitution, the technical rules of statutory construction do not apply. *McCulloch v Maryland,* 17 US (4 Wheat) 316, 407; 4 L Ed 579 (1819); *Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971).

*DeJonge, supra* at 274. The intent of the framers may be determined, at least in part, through the use of the rule of "common understanding." *Traverse City School Dist v Attorney General*, 384 Mich 390, 405; 185 NW2d 9 (1971). Justice Cooley in Cooley's Const Lim 81, described this rule as follows:

> A constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it. "For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed."[4]

Similarly, contemporaneous legislative[5] and judicial[6] interpretations aid in ascertaining original intent and the common understanding.

---

[4] Quoted with approval in *Council of Organizations v Governor*, 455 Mich 557, 569; 566 NW2d 208 (1997); *Soap & Detergent Ass'n v Natural Resources Comm*, 415 Mich 728, 745; 330 NW2d 346 (1982); *Council No 11, AFSCME v Civil Service Comm*, 408 Mich 385, 405; 292 NW2d 442 (1980); *Traverse City School Dist, supra* at 405;

[5] See *Harmelin v Michigan*, 501 US 957, 980; 111 S Ct 2680; 115 L Ed 2d 836 (1991), in which Mr. Justice Scalia stated that it was necessary to examine "[t]he actions of the First Congress, which are of course persuasive evidence of what the Constitution means."

[6] See *Advisory Opinion Re: Constitutionality of 1972 PA 294*, 389 Mich 441, 470; 208 NW2d 469 (1973), in which the Michigan Supreme Court stated:

> A second consideration in determining the meaning of constitutional language is the analysis of precedent. How have the courts interpreted this language? In pursuing precedent, those cases decided at a time proximate to the ratification of the constitution

### 2. CIRCUMSTANCES AND PURPOSES

A second rule of constitutional construction requires consideration of the circumstances surrounding the adoption of a constitutional provision and the purposes sought to be accomplished. In *Kearney v Bd of State Auditors*, 189 Mich 666, 673; 155 NW 510 (1915), the Michigan Supreme Court stated:

> In construing constitutional provisions where the meaning may be questioned, the court should have regard to the circumstances leading to their adoption and the purpose sought to be accomplished.[7]

As stated by the Michigan Supreme Court in *House Speaker v Governor*, 443 Mich 560, 581; 506 NW2d 190 (1993), the most instructive tool for discerning the circumstances surrounding the adoption of the provision is the floor debates in the Constitutional Convention record. However, the consideration of the debates is limited because:

> They are individual expressions of concepts as the speakers perceive them (or make an effort to explain them). Although they are sometimes illuminating, affording a sense of direction, they are not decisive as to the intent of the general convention (or of the people) in adopting the measures. [*Univ of Michigan Regents v Michigan*, 395 Mich 52, 59-60; 235 NW2d 1 (1975).]

However, the Court also noted that these floor debates are particularly helpful "when we find in the debates a recurring thread of explanation binding

---

are important in that they better reflect the meaning of the language of the constitution at the time it was written.

[7] See *Soap & Detergent Ass'n*, n 4, *supra* at 745, and *Traverse City School Dist*, *supra* at 405.

together the whole of a constitutional concept." *Id.* at 60.

### 3. AVOIDANCE OF CONSTITUTIONAL INVALIDITY

A third rule of constitutional construction requires the avoidance of an interpretation that creates a constitutional invalidity. *House Speaker, supra* at 585.

### 4. COMPLETE EFFECT AND PLAIN MEANING

This rule of interpretation contains two prongs. The first prong is to give effect to the entire section of the constitution. The second prong is to give the words of the constitution their usual and ordinary meaning. *People v Bd of State Canvassers,* 323 Mich 523, 529; 35 NW2d 669 (1949).

### II. THE BOARD VERSUS THE SUPERINTENDENT AS THE "HEAD" OF THE DEPARTMENT OF EDUCATION

Executive Order No. 1996-11, in effect, made the superintendent, rather than the board, the head of the Department of Education. Plaintiffs argue that the constitutionally vested duty of the board to provide leadership and general supervision over all public education, necessarily requires the board to be the head of the Department of Education. The lower court agreed, finding that Const 1963 by implication provides for the board to be the head of the Department of Education.

Const 1963, art 8, § 3 does not explicitly state that the board is to be the head of the Department of Education. This language is, however, contained in § 301 of the Executive Organization Act of 1965, MCL 16.401; MSA 3.29(301). Both of the Governor's powers under art 5, § 2 are implicated under Executive Order No. 1996-11. Empowering the superintendent as the

head of the Department of Education certainly consti-
tutes a "change" in the organization of the executive
branch. Similarly, to the extent that serving as the
head of the Department of Education constitutes a
"function," Executive Order No. 1996-11 certainly
transferred that function from the board to the super-
intendent. Thus, the question is whether the change
in organization or transfer of functions accomplished
by Executive Order No. 1996-11 impinged upon the
board's constitutional function of providing leader-
ship and general supervision over all public education
in Michigan.[8]

I would hold that the board is constitutionally
empowered, as part of its function of providing lead-
ership and general supervision over all public educa-
tion in the state, to head the Department of Educa-
tion. To this end, the Legislature contemporaneously
vested this function in the board in § 301 of the Exec-
utive Organization Act of 1965 and Lieutenant and
Acting Governor Milliken did the same in Executive
Order No. 1965-19. I regard these actions as signaling
a contemporaneous understanding that the constitu-
tion requires such an outcome.

Likewise, contemporaneous judicial interpretations
support this holding. In *Welling v Livonia Bd of Ed*,
382 Mich 620, 625; 171 NW2d 545 (1969), Justice
BLACK, in a concurring opinion joined by Justices
T. M. KAVANAGH and T. G. KAVANAGH, stated:

---

[8] Plaintiffs do not argue, and the lower court did not find, that Execu-
tive Order No. 1996-11 impinged upon the board's other four delineated
functions under Const 1963, art 8, § 3 (i.e., serving as the general planning
and coordinating body for all public education, including higher educa-
tion; advising the Legislature with regard to the financial requirements in
connection therewith; appointing the superintendent; and determining the
term of office of the superintendent).

Formerly the constitutional responsibility for such administration, with duties "prescribed by law," devolved upon an elected superintendent of public instruction (Const 1908, art 11, § 2). By the Constitution of 1963, however, the framers proposed and the people adopted a new policy for administration of the system. Now the State board of education, unfettered by those qualifying words "prescribed by law" or "provided by law," is armed and charged exclusively with the power and responsibility of administering the public school system which the legislature has set up and now maintains pursuant to section 2 of the eighth article. By section 3 of the same article, the board has been directed—not by the legislature but by the people—to lead and superintend the system and become, exclusively, *the administrative policy-maker thereof.* That specific directive having come from the people, the legislature may not by law interfere with its execution by the board. [*Id.* (emphasis supplied).]

Indeed, the general supervisory power over education formerly vested in the superintendent under the 1908 Constitution is, under Const 1963, reposed in the board. Under a Type II transfer as provided in Executive Order No. 1996-11, the board loses autonomous control over its functions. *Soap & Detergent Ass'n v Natural Resources Comm,* 415 Mich 728, 748-749; 330 NW2d 346 (1982); MCL 16.103(b); MSA 3.29(3)(b). The change proposed by Executive Order No. 1996-11 would return the running of public education to the system in place under the Constitution of 1908. If Executive Order No. 1996-11 is implemented, the superintendent will once again become the main voice in public education in Michigan. Such a change would essentially eliminate the transfer of power voted on by the people when they voted for the 1963 constitution and would render the transfer meaningless.

III. THE TRANSFER OF STATUTORY "FUNCTIONS" FROM THE BOARD
TO THE SUPERINTENDENT.

Executive Order No. 1996-12 transferred the "administrative statutory powers, duties, functions, and responsibilities" of the board set forth in some 139 different sections of the Michigan Compiled Laws from the board to the superintendent. Plaintiffs argue that these transfers directly affect the authority of the board to "lead and control." The lower court agreed, finding that the executive orders represent an unconstitutional transfer of the board's authority, power, and responsibility to the superintendent.

Here, the Governor's powers under art 5, § 2 to make changes in the assignment of functions among the units of the executive branch are at issue. Clearly, the Governor has the authority under art 5, § 2 to transfer all the authority, powers, duties, functions, and responsibilities of a *legislatively created principal department* to a gubernatorially created principal department. *House Speaker, supra* at 564. I believe that the Governor has similar authority with respect to legislatively created boards and commissions. Here, however, the board is *not* a legislatively created entity. The board is a constitutionally created entity and, therefore, the Governor cannot exercise his art 5, § 2 powers to impair or restrict powers derived directly from the people under the constitution. *Michigan Civil Rights Comm v Clark*, 390 Mich 717; 212 NW2d 912 (1973). Although the functions sought to be transferred by Administrative Order No. 1996-12 were created by the Legislature through enactment of the relevant statutes, the statutes were enacted to vest functions in the board pursuant to the constitutional directive that the board have "leadership and control"

over public education. Thus, the transfer of functions derogates the constitutional powers of the board.

Simply put, although there appears to be no dispute that the Legislature has authority to *repeal* statutorily granted functions, the Governor does not have the authority to transfer such statutorily granted functions that were given to the board pursuant to the constitutional responsibility placed on the board to provide leadership and general supervision over all public education in Michigan. Although this holding does not avoid a constitutional invalidity, I would conclude that this holding is most consistent with the common understanding of art 5, § 2 and art 8, § 3 and is the interpretation that "reasonable minds, the great mass of the people themselves," would give to these provisions.

In sum, I believe that Executive Order Nos. 1996-11 and 1996-12 infringe the board's constitutional powers under Const 1963, art 8, § 3 and that the executive orders at issue are not within the scope of the Governor's authority under Const 1963, art 5, § 2. I would affirm the lower court's permanent injunction against implementation of these orders.